**In re HOOKER INVESTMENTS, INC., LJ Hooker Corporation, Inc., et al., Debtors.**

Bankruptcy Nos. 89–B–11986, 89–B–12000, 89–B–12199, 89–B–12389, 89–B–12696, 89–B–12741, 89–B–13377, 89–B–13340, 90–B–10058, 90–B–10374, 90–B–10395, 90–B–10675, 90–B–10733, 90–B–11869, 90–B–11879, 90–B–12284 (TLB).

United States Bankruptcy Court, S.D. New York.

July 17, 1992.

See also 131 B.R. 922.

Proskauer Rose Goetz & Mendelsohn by David I. Goldblatt, Michael Foreman, Todd S. Chasin (on brief), New York City, for debtors.

Anderson Kill Olick & Oshinsky, P.C. by Martin F. Brecker, Susan G. Papano, New York City, for John J. Schultz.

## MEMORANDUM DECISION DETERMIN-ING THAT EXECUTIVE'S CLAIM IS NOT SEVERANCE PAY AND IS NOT AN EXPENSE OF ADMINIS-TRATION

PRUDENCE B. ABRAM, Bankruptcy Judge.

The court is required to determine whether the debtors should be required to pay over $4 million as an expense of administration to a terminated executive whose prepetition employment contract has been rejected. The executive claims that the monies constitute severance pay. The executive urges that several decisions of the Second Circuit decided under the former Bankruptcy Act mandate that his claim be paid in full as an expense of administration since his employment was terminated post-filing. The debtors argue that the amount sought is not an expense of administration, is merely liquidated damages under the employment contract and not severance pay, and that, in any event, the decisions relied on by the Claimant are not controlling.

The parties have cross-moved for summary judgment. For the reasons which follow, the Court holds in favor of the Debtor.

### FINDINGS OF FACT [1]

1. On August 9, 1989 (the "Filing Date") and thereafter, the Debtors, including LJ Hooker Corporation ("LJH") and B. Altman & Co. ("B. Altman"), filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code (the "Code"). The Debtors' chapter 11 cases were assigned to the Honorable Tina L. Brozman. Judge Brozman has recused herself with respect to this matter.

[1]. Subject only to editing for consistency of form, Findings 1 through 3 and 6 through 18 are those stipulated to by the parties. Finding 4 is based on the Debtors' court-approved Disclosure Statement. Finding 5 recites certain terms of an undisputed contract. The court has included as its Findings of Fact all of the facts stipulated to by the parties although the court does not deem a number of them to be material to the resolution of the cross-motions.

2. At all times on and between April 1, 1986 and January 31, 1990, the claimant, John J. Schultz ("Claimant") was employed as President and Chief Executive Officer of B. Altman. The employment contract (the "Contract") upon which the administration claim is based was executed as of April 21, 1989.

3. The Contract was executed by Claimant and by Michael Babcock as President and Chief Executive Officer of "L.J. Hooker Retail Group." At all relevant times, "L.J. Hooker Retail Group" has not been a corporation, and has not been a Debtor, and has had no jural existence. LJ Hooker Retail Group was an operating division of LJH. B. Altman was and is a wholly owned subsidiary of Debtor B.A. Holdings, Inc., which was and is in turn a wholly owned subsidiary of LJH.[2]

4. As described in the Debtors' Modified Second Amended Disclosure Statement dated March 11, 1992 ("Disclosure Statement"), the Debtors determined shortly after the Chapter 11 filings and in early Fall 1989 that due to their limited resources the B. Altman retail chain would have to be disposed of either as a going concern or through an asset liquidation. On November 17, 1989 after an auction hearing was held before the Bankruptcy Court, the Debtors, in consultation with the Creditors' Committee, agreed that conducting a going-out-of-business sale would best maximize B. Altman's value. The Bankruptcy Court approved a going-out-of-business sale that day. Shortly thereafter, the B. Altman liquidation was conducted.

5. Paragraph 5(c) of the Contract provides, *inter alia*, that

"(c) *By the Company without Cause.* The Company may terminate this Agreement and Employee's employment hereunder at any time without cause by written notice to Employee, provided that the company shall have no such right of termination if the purpose of the termination is to prevent Employee from realizing the benefit of an award of shares of stock pursuant to section 3(c).

\* \* \* \* \* \*

In the event of any termination under this section 5(c) prior to the end of the fifth employment year, the Company shall pay to Employee all accrued salary and benefits through the date of termination and shall either: (i) make a lump sum payment to Employee equal to the aggregate due under this Agreement during the remaining portion of the first five (5) employment years in the absence of such early termination, discounted to present value using the prime or base rate of interest of Citibank, N.A., New York, New York (the "Citibank Prime Rate") in effect on the date on which the termination occurs; or (ii) if elected by Employee as provided in the following sentence, continue to make payments of such base salary in accordance with the regular schedule therefor as if such termination had not occurred. \* \* \* Employee shall have no obligation to mitigate damages in the event of a termination pursuant to this section 5(c); however, the amount of and payment to Employee shall be reduced by the total amount of any compensation paid or payable to Employee in connection with any activity by Employee that would be proscribed by section 7 hereof in the absence of the Company's consent."

6. The Claimant seeks to have all the monies which would be due to him under the provisions of Paragraph 5(c) treated as an expense of administration. By Claimant's calculation the amount due to him is in excess of $4,000,000.

7. On September 21, 1989 the Debtors sent the Claimant a letter informing him of their intention to move for rejection of the Contract. The Claimant received the letter on or about September 21, 1989.

8. By application dated October 4, 1989, the Debtors moved before Judge Brozman for an order rejecting various employment

---

**2.** There had been an issue about which of the Debtors was liable on the Contract since the Contract was executed by a non-existent entity. It is unnecessary to resolve this issue now that the Debtors have proposed and had confirmed a plan of reorganization that effectively merges their assets and liabilities.

agreements, including the Claimant's. The Debtors also sought authorization to pay retention bonuses and other compensation to selected employees, including the Claimant. The Claimant received notice of the application on or about October 4, 1989.

9. On October 16, 1989, the Debtors circulated a memo concerning retention bonuses, which the Claimant received on or about October 16, 1989.

10. On October 26, 1989, the Debtors sent the Claimant a letter concerning retention bonuses, which the Claimant received on or about October 26, 1989.

11. At a hearing on October 30, 1989 on the Debtors' pending application, Judge Brozman entered an order rejecting certain employment contracts and authorizing the Debtors to grant retention bonuses. The Claimant was present in Court as a spectator during the hearing although his counsel was not. Due to Judge Brozman's recusal, the rejection portion of the Debtors' motion was withdrawn as to the Claimant.[3] On February 2, 1990, the Debtors' renewed their motion for rejection of the Claimant's contract before the undersigned. On March 8, 1990, this Court "so ordered" the rejection of the Contract, without prejudice to the Cross–Motion.

12. On January 16, 1990, the Claimant circulated a memo on behalf of the Debtors concerning retention bonuses, which the Debtors received on or about January 16, 1990.

13. On January 16, 1990, the Claimant circulated a memo to the Debtors concerning unauthorized use of his facsimile signature on any severance pay check issued to him. The Debtors received this memo on or about January 16, 1990.

14. On January 17, 1990, the Debtors sent the Claimant a letter terminating his employment as of January 31, 1990. The Claimant received this letter on or about January 17, 1990.

15. During the Claimant's employment, B. Altman maintained a Personnel Policy Manual. The manual included policies regarding various employee benefits, including an "Executive Separation Pay" policy.

16. On January 10, 1990, the Claimant received a check and accompanying pay stub in the amount of $27,837.05.

17. On January 30, 1990, the Claimant also received a separate check and accompanying pay stub in the amount of $87,997.46, the equivalent of five months' salary.

18. The Claimant received his normal salary and fringe benefits for the month of February 1990.

19. On March 2, 1990, the Claimant filed his Cross–Motion for the Classification and Allowance of Severance Pay Claim as an Administrative Expense ("Cross–Motion").

## DISCUSSION

*Summary Judgment Standards*

At least some consideration must be given at the outset to the procedural posture of this matter. Unfortunately, the parties seem to have been more concerned with the substance of their arguments than with the method by which they have presented them. In the end, this matter is before the court on oral cross-motions for summary judgment on whether the Claimant has an expense of administration claim based on a stipulation of facts between the parties. The Debtors and the Claimant do not seek to have this court determine at this time the amount of any administration claim nor do they seek to have this court fix and allow the Claimant's pre-petition claim.

To prevail on a motion for summary judgment, the movant must satisfy the criteria set forth in F.R.Civ.P. 56 ("Rule 56") as incorporated in F.R.Bkrtcy.P. 7056 which is made applicable to contested matters by F.R.Bkrtcy.P. 9014. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to inter-

---

**3.** The parties disagree as to whether (a) whether Judge Brozman recused herself as to the retention bonus aspect of the motion as it concerned the Claimant, and (b) the Debtors' motion for authority to grant retention bonuses was withdrawn as to the Claimant.

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Eastman Machine Co. Inc. v. United States*, 841 F.2d 469 (2d Cir.1988); *In re Lasercad Reprographics, Ltd.*, 106 B.R. 793, 797 (Bankr.S.D.N.Y.1989); *In re Tikijian*, 76 B.R. 304, 321 (Bankr.S.D.N.Y. 1987). A fact is material only if it affects the result of the proceeding. A fact is in dispute only when the opposing party submits evidence such that would require a trial to resolve the differences. *In re Tikijian*, 76 B.R. at 313; *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

 The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of fact to be tried, and not to determine any disputed facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983); *In re Ross*, 64 B.R. 829, 836 (Bankr.S.D.N.Y.1986). On a cross-motion for summary judgment a Court must determine whether one of the parties is entitled to judgment as a matter of law based on undisputed facts. *In re TTS, Inc.*, 125 B.R. 411, 413 (Bankr.D.Del. 1991).

 It has been held that summary judgment is appropriate even when the *issue* is a contract's proper construction so long as the words of the contract convey a definite and precise meaning absent any ambiguity. *See Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). It is axiomatic that a contract is to be interpreted so as to give effect to the intent of the parties as expressed in the unequivocal language employed. *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985) *rearg. denied*, 67 N.Y.2d 647, 499 N.Y.S.2d 1031,

490 N.E.2d 558 (1986); *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978) *rearg. denied*, 46 N.Y.2d 940, 415 N.Y.S.2d 1027, 388 N.E.2d 372 (1979). It is well settled in New York that the threshold decision on whether a writing is ambiguous is the exclusive province of the court. *Sutton v. East River Savings Bank*, 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1077 (1982); Patterson, *Interpretation and Construction of Contracts*, 64 Colum.L.Rev. 833, 839 (1964). If the language used is ambiguous, then summary judgment is inappropriate. "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Associates, Inc., supra*, 959 F.2d at 428.

The key material fact in this case is the Contract and neither party disputes its existence or content. The parties have not stipulated to the circumstances surrounding the negotiations for and execution of the Contract. Neither party disputes that the Claimant rendered necessary and requested services to the Debtors after the Filing Date, that the Contract was rejected pursuant to court order, and that his employment by the Debtors has been terminated.

 The Debtors and the Claimant disagree about the Claimant's characterization of the payments provided for in Paragraph 5(c) of the Contract as severance pay. However, this dispute does not render the Contract ambiguous. This court concludes that it can properly determine characterization by reference to the Contract alone because the Contract is unambiguous. This court finds no material issues of fact in dispute which would preclude resolution of the administration status issue on the cross-motions for summary judgment.

*Employment Contracts As Executory Contracts*

 The provisions of Code § 365 govern the assumption or rejection of an executory contract. The assumption or rejection of an executory contract is subject to the court's approval. *See* Code § 365(a).

Employment agreements have been held to be executory contracts subject to rejection under Bankruptcy Code ("Code") § 365. *See In re Jolly,* 574 F.2d 349, 351 (6th Cir.1978), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978); *In re Uly–Pak, Inc.,* 128 B.R. 763 (Bankr.S.D.Ill. 1991). Executory contracts other than certain real estate contracts may be assumed or rejected any time before confirmation. *See* Code § 365(d)(2).

The Debtors and the Claimant have stipulated that the Debtors originally moved to reject the Contract in October 1989. See Finding 7. This was two months after the Chapter 11 cases were filed. That portion of the rejection motion relating to the Claimant was withdrawn due to the assigned judge's recusal. See Findings 1 and 11. Thereafter in February 1990, the Debtors renewed their rejection motion as to Claimant. On March 8, 1990, an order was signed authorizing rejection of the Contract. See Finding 19.

Here the Claimant had actual knowledge that the Debtor intended to reject the Contract shortly after the Chapter 11 cases were commenced. Indeed, the Debtors moved to reject the Contract within two months of the Filing Date. If the Claimant was unhappy with the unsettled position between the time the October motion was withdrawn and February when the Debtors made a new motion, he could have moved to compel the Debtors to assume or reject the Contract. He did not.

*The Effect of Rejection*

■ The dispute in this matter concerns the consequences of rejection. Generally speaking, the consequences of rejection are two-fold. First, the non-debtor party to the contract has a claim against the debtor for damages for the breach of the contract, which claim is deemed to have arisen immediately before the filing of the petition and is a pre-petition claim.[4] It is undisputed in this case that the Claimant may assert a pre-petition claim for the breach of Contract by virtue of its rejection. While that claim is not now before the court, it is relevant to note that the allowance of that claim would be affected by Code § 502(b)(7). Code § 502(b)(7) limits a claim for breach of an employment contract to the compensation provided by the contract for one year after the breach.[5]

Secondly, the non-debtor has an expense of administration claim for any benefits received by the debtor in possession prior to rejection. The expense of administration claim is governed by Code § 503(b) which states that there shall be allowed as administration expenses "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case."

The Claimant and the Debtors disagree as to whether the Debtors, in their status as debtors in possession, are liable for the amount sought by the Claimant an expense of administration claim. It is the position of the Debtors that the Claimant has been fully compensated by it for any benefits received by them prior to rejection of the Contract by virtue of the post-petition payments made to the Claimant, which included normal salary and fringe benefit payments through February 1990. See Finding 18.

There has been much dispute between the Claimant and the Debtors over a check for $87,997.46 that represented a payment under the retention bonus program the

---

**4.** Code § 365(g) states that "rejection of an executory contract * * * constitutes a breach of such contract * * * (1) if such contract * * * has not been assumed * * * immediately before the date of the filing of the petition * * *".

**5.** Code § 502(b) states that a claim shall be allowed except to the extent that—

"(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

Debtors had approved by the Bankruptcy Court. In this Court's view, the disputes over who signed the check and whether it was signed without authority and the like, see Findings 12–17, are not material to the resolution of the present motion. Any payments actually made to the Claimant should not prejudice his right to assert that the Paragraph 5(c) payments provided for in the Contract are expenses of administration because the Debtors were always aware of the Claimant's position and never changed their position in reliance on the acceptance of any payments by the Claimant. However, the existence of the retention bonus program could be a factor in determining the amount of any administration claim held by Claimant.

*The Principles Governing the Amount of An Administration Claim When A Contract is Rejected*

The leading case in this Circuit setting forth the principles governing the amount of an administration claim when a contract is rejected is *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene ("American Anthracite")*, 280 F.2d 119 (2d Cir.1960). In *American Anthracite,* decided under § 64a(1) of the former Bankruptcy Act on which Code § 507(a)(1) is based,[6] the Second Circuit explained:

"The right to priority in the event the contract is assumed follows from the fact that the trustee or debtor in possession has elected to make the contract of the debtor his own, just as if it had been made by the trustee or debtor in possession in the first instance. *The right to priority [i.e. an administration expense claim] in the event the trustee or*

**6.** *American Anthracite* has been accorded continued vitality numerous times since the adoption of the Code. *See,* e.g., *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir.1986); *In re Midland Capital Corp.,* 82 B.R. 233, 239 (Bankr.S.D.N.Y.1988); and *Collier on Bankruptcy* (L. King 15th ed. 1992), ¶ 503.04[1][a][ii], n. 14.

**7.** In *Straus–Duparquet* the Court held "[s]ince severance pay is compensation for termination of employment and since the employment of these claimants was terminated as an incident of the administration of the bankrupt's estate, severance pay was an expense of administration and is entitled to priority as such an expense."

*debtor in possession receives benefits under the contract during the interval between the filing of the debtor's petition and the rejection of the contract 'is an equitable right based upon the reasonable value' of the benefits conferred, rather than upon the contract price.''* 280 F.2d at 124. (emphasis added).

Subsequently, the United States Supreme Court in *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), held that a claim based on the post-petition negligence of a receiver constituted an expense of administration. The Supreme Court looked to the general purposes of § 64a, Chapter XI and the Bankruptcy Act as a whole and determined that the negligence of the receiver gave rise to an "actual and necessary" cost of operating the debtor's business. The Supreme Court found it "more natural and just" that those injured by the operation of the business should be compensated ahead of the pre-petition creditors for whose benefit the business was carried on. 391 U.S. at 482–3, 88 S.Ct. at 1765–66.

*Severance Pay as an Expense of Administration*

The Claimant points to a line of Second Circuit decisions under the former Bankruptcy Act which held that claims for severance pay were entitled to expense of administration status when the termination of employment occurred post-petition. *See Straus–Duparquet, Inc. v. Local Union No. 3,* 386 F.2d 649 (2d Cir.1967); *In re Unishops, Inc.,* 553 F.2d 305 (2d Cir.1977); and *In re W.T. Grant Co.,* 620 F.2d 319 (2d Cir.1980).[7]

386 F.2d at 651. The claimants who were union employees received a maximum of two weeks' pay as severance. The Second Circuit rejected the argument that severance pay was earned day-to-day.

The Second Circuit's decisions in *Unishops* and *W.T. Grant* were similar. In *Unishops* the court allowed an expense of administration claim of $100,000, an amount equal to one year's salary, to the chief executive officer of a debtor who worked for a period of eight months following the filing of a bankruptcy petition and who had a written employment agreement with the debtor which had not been assumed or rejected. In *W.T. Grant,* the Second Circuit

The Claimant asserts that this court is bound by these three Second Circuit decisions to hold that the entire amount he claims as severance pay is an expense of administration despite the magnitude of the claim. This court disagrees.

 The doctrine of *stare decisis*, which is derived from considerations of stability and equal treatment, dictates adherence to prior decisions of controlling courts on issues of law. *See generally* 1B Moore's Federal Practice (2d Ed.1992), ¶ 0.401. It is a doctrine of fundamental importance to the rule of law. *Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468, 494, 107 S.Ct. 2941, 2957, 97 L.Ed.2d 389 (1987). However, *stare decisis* requires this court to follow a decision of the Second Circuit only when the effect of a decision has not been nullified in some fashion, such as by reversal, vacation or disapproval by the United States Supreme Court, or been questioned in subsequent decisions by the Second Circuit itself, or has not been rendered irrelevant by changes in the positive law. *See* 1B Moore's Federal Practice (2d Ed.1992) ¶ 0.402[2].

Considerations of *stare decisis* are accorded special force in the area of statutory interpretation because the legislative power is implicated and Congress remains free to alter what the court has done. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 172–3, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989). A court is warranted in shifting position when there has been intervening development in the law, either through the growth of judicial doctrine or further action taken by Congress. *Patterson*, 491 U.S. 164, 109 S.Ct. 2363. Changes in the governing law may have removed or weakened the conceptual underpinnings of the prior decision or later law may have rendered the decision irreconcilable with competing legal doctrines or policies. *Patterson*, 491 U.S. at 173, 109 S.Ct. at 2371.

The governing law that the Second Circuit was interpreting in *Straus–Duparquet*, *Unishops* and *W.T. Grant* was the former Bankruptcy Act. That statute was superseded by the Code, more formally known as the Bankruptcy Reform Act of 1978. The Code as originally enacted differed from the former Bankruptcy Act in that for the first time there was a limitation on the allowability of claims arising from the rejection of employment agreements. See Code § 502(b)(7). In the intervening years, there have been further amendments to the Code and case law developments that are relevant. In particular, following the decision of the United States Supreme Court in *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984),[8] Congress amended the Code to define the conditions under which rejection of labor contracts would be permitted and imposed obligations on debtors to perform under the labor contracts prior to rejection. *See* Code § 1113. Further employment-related amendments have been made. *See* Code § 1114 (certain insurance benefits must be paid to retirees). Another pertinent modification to the Code was that made in 1984 mandating that the pre-rejection amount paid landlords be the rent reserved in the lease. *See* Code § 365(d)(3).

The First Circuit has never followed the rule of the Second Circuit, *see In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir. 1976), and has expressly rejected the Second Circuit's reasoning in *Straus–Duparquet*. The First Circuit reasoned as follows:

allowed as an administrative expense the severance pay claims of employees of some 32,000 employees that had been retained by the debtor during its attempt at reorganization.

**8.** In *Bildisco* the United States Supreme Court found that collective-bargaining agreements were included within the general scope of Code § 365(a) and could be rejected as executory contracts. The Supreme Court rejected the strict standard that had been set by the Second

Circuit in its decision in *Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.*, 523 F.2d 164, *cert. denied* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975), for the rejection of collective bargaining agreements. The Supreme Court found that the strict standard in *REA Express* was "fundamentally at odds with the policies of flexibility and equity built into Chapter 11". 465 U.S. at 525, 104 S.Ct. at 1196.

"When the debtor-in-possession commits a tort, *see Reading Co. v. Brown, supra,* or accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority. Here the wages and four weeks' salary severance pay that the debtor-in-possession paid appellants fully compensated them for the services performed after the petition was filed. The claims for additional severance pay are based entirely upon services performed by appellants to the debtor and, as such, are not entitled to priority." 536 F.2d at 955.

*See also In re Health Maintenance Foundation,* 680 F.2d 619 (9th Cir.1982). *See also generally In re Landmark Land Co.,* 136 B.R. 410, 412–13 (D.S.C.1992) (collecting authorities).

In *Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.,* 789 F.2d 98 (2d Cir.1986), a Code case, the Second Circuit declined to accord administrative expense status to the debtor's withdrawal liability under a multiemployee pension and employee benefit plan. The Second Circuit held that a debt is not entitled to administration expense priority simply because the right to payment arises after the debtor-in-possession begins to manage the estate. 789 F.2d at 101. The Second Circuit concluded that the withdrawal liability claim was not entitled to priority even though the debtor's participation in the plan terminated post-petition because the consideration supporting the withdrawal liability was the prepetition labor of the employees covered by the plan. 789 F.2d at 101–4. The Second Circuit, which cited extensively to *Mammoth Mart,* hinted that it might be prepared to reconsider its earlier decisions when it acknowledged the general rule that when severance pay, like vacation pay, represents compensation for the employee's past services, it is not an administrative expense entitled to priority. 789 F.2d at 104.

For all of these reasons, this court finds that the doctrine of *stare decisis* does not require it to follow *Straus–Duparquet, Unishops* and *W.T. Grant* blindly. Those precedents must and can be reconsidered in light of the changes in the governing law and business world and of the rulings of the United States Supreme Court and other courts, including the Second Circuit itself.

*Contract Characterization as Liquidated Damages Not Severance*

■ Characterization of the payments due the Claimant under the Contract as severance is fundamental to the Claimant's theory of entitlement to $4 million as an expense of administration. A review of the Contract indicates that the proper characterization of the Claimant's claim is as one for damages rather than severance pay.

The term "severance" never appears in Paragraph 5(c) of the Contract on which Claimant bases his rights. Paragraph 5(c) uses only the term "damages" and incorporates concepts consistent with that designation, most particularly the concept of mitigation.

■ This court does not find any language in Paragraph 5(c) ambiguous. Where language has been chosen containing no inherent ambiguity or uncertainty, courts are properly hesitant, under the guise of judicial construction, to imply additional requirements to relieve a party from asserted disadvantage flowing from the terms actually used. *Collard v. Incorporated Village of Flower Hill,* 52 N.Y.2d 594, 604, 439 N.Y.S.2d 326, 331, 421 N.E.2d 818, 823 (1981).[9] *See also Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 646, 477 N.E.2d 1099, 1100, *rearg. denied,* 65 N.Y.2d 785, 492 N.Y.S.2d 1026, 482 N.E.2d 568 (1985) (where intention of the parties is clearly and unambiguously set forth, effect must be given to intent as indicated by the language used). This court sees no reason to disturb the designation which the parties negotiated themselves. *Compare In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687 (Bankr.S.D.N.Y.1992) (Court

---

**9.** Since the Contract was prepared, entered into and performed entirely in New York State, the laws of New York govern its interpretation. *In re Shangri–La Nursing Center, Inc.,* 31 B.R. 367 (Bankr.E.D.N.Y.1983); *In re McCorhill Publishing, Inc.,* 86 B.R. 783 (Bankr.S.D.N.Y.1988).

refused to accept designation of certain amounts in contract as severance as controlling and found that allowing the payment merely because it was labelled severance in the contract "would elevate form, which may sometimes have substance, over a substance which is as to this issue as substantial as an elephant.")

It is clear that Paragraph 5(c) satisfies the elements by which liquidated damage clauses are tested. First, the amount of the liability imposed on the Debtors under Paragraph 5(c) of the Contract is simply the full amount of all unpaid salary and fringe benefits for the balance of the stated term of the Contract. This provision for damages does not appear to be so grossly disproportionate to a foreseeable injury that it constitutes a penalty, particularly since the amount of the liability goes down the longer the Claimant remains employed. In fact, the provision bears a reasonable relation to foreseeable loss since it merely gives the Claimant the benefit of his bargain.

The provision at issue also satisfies the second prong of the liquidated damages test—that the actual loss from the breach be difficult to ascertain at the time the Contract is executed. Actual damages would typically be calculated by taking the present value of earnings under the contract minus what the employee has earned or expects to earn at another job during the unexpired contract period. *Rattigan v. Commodore International Ltd.*, 739 F.Supp. 167, 172 (S.D.N.Y.1990). Claimant's contract, however, provides for forms of compensation aside from Claimant's salary, including bonuses and stock options, which must be taken into consideration in determining actual damages. Further, neither party could know ahead of time whether, or the extent to which, the Claimant would or could mitigate damages particularly since the Claimant was under no contractual obligation to mitigate damages in the event of a termination without cause. *See generally Boyle v. Petrie Stores Corp.*, 136 Misc.2d 380, 518 N.Y.S.2d 854 (Sup.Ct.N.Y.1985) and *Musman v. Modern Deb, Inc.*, 50 A.D.2d 761, 377 N.Y.S.2d 17 (1st Dept.1975). It is commonplace for contracting parties to determine in advance the amount of compensation due in case of breach of contract. *United Air Lines, Inc. v. Austin Travel Corporation*, 867 F.2d 737 (2d Cir.1989).

Under New York law, parties have the right to specify within a contract the damages to be paid in the event of breach, so long as such a clause is neither unconscionable nor contrary to public policy. *Rattigan*, 739 F.Supp. at 169; *Truck Rent–A–Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 393 N.Y.S.2d 365, 361 N.E.2d 1015 (1977). Liquidated damages clauses are generally be upheld by a court. *United Air Lines*, 867 F.2d at 740; *Rattigan*, 739 F.Supp. at 169. The parties may agree upon damages in advance when the liquidated amount bears a reasonable relationship to the anticipated probable loss and the amount of actual loss from a breach is incapable or difficult of precise estimation. *United Air Lines,* 867 F.2d at 740; *see also Rattigan*, 739 F.Supp. at 169; *Leasing Service Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir.1982). Further, the reasonableness of the liquidated damages and the certainty of actual damages both must be measured as of the time the parties enter the contract. *Rattigan*, 739 F.Supp. at 169.

Both parties to the Contract were sophisticated and negotiated the Contract at arms length. "This is a factor to be taken into consideration in determining whether one side is not exacting an unconscionable penalty." *Rattigan*, 739 F.Supp. at 172, *citing Boyle*. Most significantly if there is any unfairness, penalty or coercive effect in Paragraph 5(c) of the Contract it is as to the Debtors and not the Claimant. This court finds no reason to disturb the parties' designation of the amounts payable under Paragraph 5(c) of the Contract as damages.

*Claim as "Golden Parachute"*

It has been suggested that the Paragraph 5(c) payments should be characterized as a "golden parachute". While golden parachutes resemble the terms of typical employment agreements in many respects, they contain several unique compo-

nents. *Worth v. Huntington Bancshares, Inc.*, 1987 WL 25694 at *18, Lexis No. 52861 at 14 (Ohio Ct.App.1987). Among these are change-of-control and termination clauses.

The purpose of a golden parachute is to create an economic incentive for a corporation to retain a particular executive and to compensate that executive in a lump sum in the event of dismissal from employment under specified circumstances. *See International Insurance Co. v. Johns*, 874 F.2d 1447 (11th Cir.1989). The Supreme Court has stated that golden parachutes are traditionally lump-sum payments which shelter executives from the effects of a corporate takeover where the compensation is triggered by a change of control and termination of the executive's employment agreement. *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 3 n. 2, 105 S.Ct. 2458, 2460 n. 2, 86 L.Ed.2d 1, 4 n. 2 (1985).

A change-of-control clause would typically specify the amount of stock, acquisition of assets or change in board composition necessary to qualify as a bona fide control change. *Worth*, 1987 WL 25694 at *23-24, Lexis No. 52861 at 41. A termination clause would focus on events subsequent to the change of control—either an actual termination or a diminution of job status or responsibility. *Id.* Further, with the enactment of the Internal Revenue Code of 1986 ("IRC"), Congress adopted provisions disallowing the deduction of excess parachute payments which are defined in the IRC as payments whose aggregate value equals or exceeds an amount equal to three times the base amount of the individual's annualized taxable compensation. *See* 26 U.S.C. § 280G(b)(2)(A) and (b)(3) (1986).

Since the triggering events of a golden parachute include the severance of the employment relationship, characterization of a particular payment as a golden parachute would not preclude the possibility that a golden parachute could be viewed as a form of severance pay. Unfortunately, there is no simple test or overwhelming authority which may be used in determining whether a golden parachute is, in fact, severance pay. *See generally Richard Leberman v. John Blair & Company*, 1987 WL 26781, Lexis No. 10847 (S.D.N.Y.1987); Campbell, *Golden Parachutes: Common Sense from the Common Law*, 51 Ohio St.L.J. 279 (1990). No useful purpose would be served in this case by trying to determine whether the Contract should be characterized as a golden parachute.

*Definition of Severance Pay*

It is undisputed that the Claimant's right to the Paragraph 5(c) payments is predicated on the termination or "severance" of the employment relationship. The Claimant urges that it therefore fits within the definition of severance pay used by the Second Circuit in *Straus–Duparquet.* "Severance pay is 'a form of compensation for the termination of the employment relation, for reasons other than the displaced employees' misconduct, primarily to alleviate the consequent need for economic readjustment but also to recompense him for certain losses attributable to the dismissal.'" *Straus–Duparquet*, 386 F.2d at 651. The Second Circuit has recently held in a non-bankruptcy case that severance pay policies serve two purposes: first, to protect employees from the economic hardship of joblessness, and second, to reward employees for past service to the company. *See Bradwell v. GAF Corp.*, 954 F.2d 798, 801 (2d Cir.1992).[10]

The payments due the Claimant under Paragraph 5(c) of the Contract differ significantly from typical severance payments. The consideration for the payments due to Claimant under Paragraph 5(c) of the Contract was his original, pre-petition commitment to a five-year term of employment with the Debtors. The amount of the payments are not absolute. Indeed, they cannot be readily calculated at the moment of termination since the payments are to be

---

**10.** In *Bradwell* the Second Circuit declined to award severance pay to employees who had continued in their jobs with the purchaser of the defendant's business on the grounds that the language of the severance policy did not provide for it. The Second Circuit found its conclusion fortified by Congress rejection of vesting requirements for severance pay policies in ERISA. *Id.*, 954 F.2d at 801.

reduced in the event of mitigation. More significantly, since the amount of the payments is inversely proportional to the length of service, the payments cannot be viewed as a reward for past service to the company. The amount of the payments due under Paragraph 5(c) went down the longer the Claimant worked because less of the 5 year contract term remained. Finally, the provision for the payments seems designed more to encourage the Debtors to retain the Claimant than to protect the Claimant from the economic hardship of joblessness. In short the payments do not have the typical characteristics of severance pay. Cf. *In re 995 Fifth Avenue Associates, L.P.*, 963 F.2d 503 (2d Cir.1992) (Court analyzed characteristics of a stamp tax).

*Severance Pay Administration Claims Need Not Always Be Fixed At the Contract Rate*

■ It is important to recognize that even if this court were to characterize the monies due under Paragraph 5(c) of the Contract as severance pay, it does not automatically follow that the monies would be required to be paid in full as an expense of administration. A pre-rejection claim is equitable in nature and can differ in amount from the contract rate. *American Anthracite, supra.* Only Code § 365(d)(4) mandates that the pre-rejection administrative expense be paid at the contract rate. That section, adopted in 1984, requires a debtor to make rent payments on unassumed leases of nonresidential real property at the rent fixed in the lease, thereby overturning a long line of precedents that allowed the court to fix use and occupancy at some other amount. *Compare* Code § 1113(e). Whatever vitality a judicially created *per se* rule relative to severance pay might once have had and may continue to have when applied to ordinary at-will and non-union employees, such a *per se* rule has no continuing vitality when applied to high-powered, high-priced executives with individually negotiated contracts providing for substantial termination payments.

■ Here, the amount of Claimant's asserted administration expense is the equivalent of 4 years' compensation. While Code § 502(b)(7) with its one-year limit technically applies only to pre-petition claims,[11] it is a relevant measure of comparison. The size of the severance pay claim in this case compared to the short period of employment, and to the establishment by the Debtors in Possession of a retention bonus program for executives precludes automatic use of the contract rate as the measure of any pre-rejection expense of administration. Since this Court has found that the Section 5(c) payments are not severance, this Court need go no further in this analysis.

*Policy Reasons Preclude Result Claimant Urges*

As sympathetic as one may be to the Claimant's defeated expectations, one must be more concerned about the impact on Chapter 11 debtors and their creditors if the proposition the Claimant proposes is approved. The Claimant proposes that he became entitled to the full balance of the amounts due under his Contract, which he estimates at $4 million, as an expense of administration merely because he worked for the Debtors for a few months postpetition. The Claimant seeks to elevate to talismanic significance a contract employee's time of discharge: if it is post-petition by even one minute, the employee's termination pay claim would become an expense of administration even though the contract is subsequently rejected. No debtor could avoid the spectre of extraordinary postpetition liability except by firing all executives prior to filing. The only way to preserve a debtor's freedom of choice and maintain the flexibility and equity which are built into Chapter 11 is to hold that the right to receive individually-negotiated contract termination payments in full hinges on actual assumption and that in the ab-

---

**11.** The Debtors have urged that Code § 502(b)(7) applies to administration expenses. This court concludes that it does not because

Code § 502(b) applies only to claims that are to be determined "as of the date of the filing of the petition."

sence of actual assumption the claim is one for *quantum meruit* only.

The Claimant was an existing creditor with respect to the Contract at the Filing Date. He is seeking to jump ahead of other prepetition creditors. Any injury he has suffered does not come from the continued operation of the Debtors' businesses during the Chapter 11 period. Indeed, conceptually, he is one of the creditors for whose benefit the reorganization was being attempted. There is no obvious reason why he should be allowed to elevate his prepetition claim, which is subject to the one year limitation contained in Code § 502(b)(7), into an unlimited expense of administration merely because he remained employed for several months post-petition. The Claimant urges that he should receive exactly the same contractual payments as if his Contract were assumed even though the debtor in possession, in the exercise of its business judgment, has determined to reject the Contract because of the cessation of the B. Altman business in which it employed the Claimant. For his post-petition employment the Claimant has been compensated at the salary and benefits rate provided for in the Contract. In addition, the Debtors obtained approval for a post-petition employee retention bonus program.

How can a debtor act responsibly to creditors when, if it fires its executives prepetition it will have no management,[12] but if it does not, it will have a large expense of administration claim even if it finds it has no need for the services of those executives shortly after filing? The salutory purpose of Code § 365 to give the debtor breathing room to determine whether to assume or reject an executory contract would be wholly defeated by the absolute rule proposed by the Claimant. See Bienenstock, *Bankruptcy Reorganization* (1987) at 67 ("Additionally, the Bankruptcy Code substantially nullifies any leverage that management may have attempted to procure by having so-called golden parachute contracts providing for huge payments to management persons upon termination.") It is apparent as a matter of logic that the rights of a claimant whose contract is assumed should differ from those of a claimant whose contract has been rejected.

### CONCLUSION

The Debtors' motion for summary judgment is granted to the extent set forth above. Claimant's motion for summary judgment is denied.

The Claimant and the Debtors are directed to agree on an appropriate order. If agreement is not possible, either may settle an order on 5 days' notice.

---

12. Moreover, the debtor's day-to-day operations are conducted by those self-same executives. It seems unlikely that they would act against their personal best interests by recommending to the Board of Directors that they be fired at the same time the Board authorizes the filing of a Chapter 11 petition.