**In re RALPH LAUREN WOMENS-WEAR, INC., now named Bidermann Womenswear Corp., Debtor.**

**Bankruptcy No. 95–B–43100 (TLB).**

United States Bankruptcy Court,
S.D. New York.

July 10, 1996.

Stevens & Lee, P.C. by Joseph H. Huston, Jr., Robert Lapowsky, Wayne, Pennsylvania, for Debtor.

Otterbourg, Steindler, Houston & Rosen, P.C. by Richard J. Rubin, Scott L. Hazan, New York City, for Official Committee of Unsecured Creditors.

Stroock & Stroock & Lavan by Brian M. Cogan, Daniel Golden, Randy L. Shapiro, David P. Simonds, New York City, for Stuart L. Kreisler.

## CORRECTED TEXT OF BENCH RULING OF JUNE 12, 1996 ESTIMATING CLAIM OF STUART L. KREISLER

TINA L. BROZMAN, Chief Judge.

Stuart L. Kreisler, the debtor's former chief executive officer, has moved to have any general unsecured claim he may have against Ralph Lauren Womenswear, Inc. (the "debtor" or "RLW") estimated for purposes of voting on the debtor's plan of reorganization. It is Kreisler's position that the great majority of his claim, which arose when he was terminated postpetition, represents an expense of administration and that he has a general unsecured claim of only $84,000, which in the context of this case would be unlikely to affect the outcome of the vote. However, because the debtor has denied that Kreisler has any claim at all, Kreisler has pleaded in the alternative that he has at least an unsecured claim for the full amount he says is due him. If Kreisler's claim is as large as he says it is and is unsecured, the debtor cannot win the affirmative vote of the unsecured class because Kreisler is not in favor of the plan. Because there is inadequate time to liquidate his claim before the scheduled confirmation hearing, I agreed to estimate the claim for voting purposes. To that end I conducted an evidentiary hearing at which some four witnesses testified live and others testified through their depositions.

Prior to 1988, Kreisler was the President and Chief Executive Officer of Ralph Lauren Womenswear, a debtor in these proceedings ("RLW"). RLW was engaged in the manufacture and distribution of women's clothing bearing the "Polo by Ralph Lauren" label, to which RLW held rights pursuant to a licensing agreement with Polo Fashions, Inc. ("Polo"). In 1988, Kreisler's employment with RLW was terminated. Kreisler testified that his termination came at the urging of Polo, and this assertion is not contested by the debtors.

In January 1993, Bidermann International U.S.A., Inc. (BIUSA), the debtor's parent, asked Kreisler to return to RLW. After extensive negotiations, Kreisler agreed, under terms and conditions set forth in a letter agreement. It was stipulated that Kega Sp. Ltd. Partnership ("Kega"), a partnership created by Kreisler for tax planning purposes, would receive an annual base fee of $500,000, a guaranteed bonus of $250,000, and an additional bonus of 15% of RLW's earnings before interest and taxes (EBIT), to the extent that this figure exceeded the guaranteed amount. Kreisler, as Kega's general partner, agreed to be a full time "consultant" to RLW. As a practical matter, however, Kreisler acted as RLW's chief executive officer. This consulting agreement, which expired by its terms at the end of 1994, was subsequently extended by the parties to cover 1995.

Kreisler's return to RLW was marked by a significant improvement in that entity's erstwhile lagging fortunes. In 1992, the last full year before Kreisler's return, RLW suffered substantial operating losses. In 1994, the first full year subsequent to his return, RLW posted operating profits of over eleven million dollars. While the parties disagree over Kreisler's importance to this remarkable turnaround, it is undisputed that Kreisler did "a good job" at the helm of RLW. (Testimony of Bryan Marsal, Transcript of 5/13/96, at 94).

Despite RLW's revival, the overall financial condition of the related corporations was not good. As part of their efforts to restructure their operations, they contemplated selling RLW to its licensor, Polo, or possibly to a

third party. In light of his previous experience with Polo, Kreisler was concerned for his own job security in the event of a sale of RLW. Accordingly, in March 1995, BIUSA and Kreisler (again, through Kega) entered into a severance agreement to compensate Kreisler in the event of his termination.

The relevant part of the severance agreement states:

> In the event [BIUSA] or [RLW] is sold and (i) your employment with [RLW] is terminated without just cause at that time or within twelve months thereafter or (ii) you elect to terminate your employment because you are not maintained at that time or during the next twelve months in a job comparable to your present job and at not less than the same salary and at the same location or another location within a reasonable commuting distance therefrom, [RLW] will pay you, as a severance benefit, an amount equal to $1,750,000 such amount (less applicable withholdings) to be paid to you in full within thirty days of the termination of your employment. For purposes of this letter agreement, a sale of substantially all of the assets of [BIUSA] or [RLW] shall be deemed a sale of [BIUSA] or [RLW], as the case may be.

BIUSA agreed to provide these benefits "in consideration of [Kreisler's] contribution to the Company and [his] continued work with" RLW given "the uncertainty that acquisition discussions always represent." (Severance Agreement, Kreisler Exh. 2).

Subsequent to the execution of the severance agreement, BIUSA and RLW determined that it would be in their interests to retain Kreisler as a direct employee rather than as a "consultant" as provided by their agreements. Kreisler had no objections as long as the material terms and conditions of his employment would not be altered. Accordingly, on July 11, 1995, the parties entered into another letter agreement converting Kreisler into a salaried employee of RLW but otherwise expressly leaving the severance agreement unaffected. The debtors filed their chapter 11 petitions on July 17, 1995, a mere six days later.

After the filings, RLW and Polo entered into intense negotiations regarding the possible purchase by Polo of all of RLW's assets. During that time, the debtors kept RLW's existing management team, headed by Kreisler, in place. According to Bryan Marsal, the then recently-installed chief executive officer of BIUSA, retaining Kreisler in the employment of the debtors during the post-petition period gave him valuable leverage in negotiating a sale of RLW to Polo. In Marsal's words, Kreisler was "the alternative to a sale." Because Polo recognized that the debtors' reorganization did not necessarily hinge on Polo's purchasing RLW's assets, the debtors were able to extract a higher price from Polo for those assets. (*See* Deposition of Marsal, Kreisler Exh. 12, at 32–37).

Eventually, an agreement for the sale of RLW's assets was reached and approved by the court. Shortly thereafter, the debtors moved to reject Kreisler's employment agreements. Kreisler, the debtors, and the creditors' committee then entered into a stipulation which I later approved providing that those agreements would be deemed rejected as of October 20.

The legal consequences of what occurred are vigorously disputed. Kreisler says his postpetition termination resulted in an administrative expense claim for the full amount due him under the severance agreement and for his substantial legal costs incurred in pursuing his claim. The debtors, in addition to denying that Kreisler's claim should be treated as an expense of administration, contend that his severance claim should be avoided as a fraudulent transfer.

The parties are divided not only by legal theories but by calculations as well. They disagree on the proper calculation of EBIT for 1995 and the amount due Kreisler in additional bonus. The debtors calculated EBIT for 1995 to be $3,575,000. Kreisler argues that this number wrongly includes a charge against EBIT for RLW's share of expenses associated with a management information system ("MIS") that was put into place for the benefit of all the debtors. He had opposed the adoption of the new MIS, and believes it did not benefit RLW. Correcting for this, Kreisler calculates EBIT at $4,525,000. Because Kreisler's bonus is de-

rived from RLW's EBIT, a determination of the true amount of EBIT is obviously essential to the calculation of the bonus.

In addition, Kreisler asserts that the figure used to calculate his bonus should include sales that were booked prior to the sale of RLW to Polo, but not realized until afterwards. Pursuant to its sale agreement with Polo, RLW was paid some $1.125 million for these receivables, but did not include this amount in its EBIT, because the "proper accounting treatment" of that sum required that it be treated as a gain realized from the disposition of assets, rather than earnings. (Testimony of Colin Cooper, Trans. of 5/13/96 at 29–30).

### 1. Standards

■ Fed.R.Bankr.P. 3018(a) allows a court to "temporarily allow [a] claim or interest in an amount the court deems proper for the purpose of accepting or rejecting a plan." The statutory predicate to Rule 3018(a) is section 502(c) of the Code, which allows for the estimation of "any contingent or unliquidated claim, the fixing or liquidation of which would unduly delay the administration of the estate." Neither the Code nor the Rules prescribe any method for estimating a claim, and it is therefore committed to the reasonable discretion of the court, *In re Hydrox Chemical Co.*, 194 B.R. 617, 623 (Bankr. N.D.Ill.1996), which should employ whatever method is best suited to the circumstances of the case. *Id.; In re Thomson McKinnon Securities, Inc.*, 191 B.R. 976, 979 (Bankr. S.D.N.Y.1996).

■ The estimation of Kreisler's claim for voting purposes does not entail consideration on the merits of all the issues in dispute respecting that claim. Only those issues that affect the amount of Kreisler's *unsecured* claim need be addressed here. This being but an estimation hearing, my findings of fact will not have any preclusive effect upon the ultimate disposition of Kreisler's claim. This is due to the fundamental difference between the adjudication of a claim and its temporary allowance for plan purposes.

A trier of fact first determines which version [of the facts] is most probable and proceeds from there to determine an award in a fixed amount. An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by [the] probability that it may be sustainable only in part or not at all.

*In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 521 (Bankr.E.D.N.Y.1994). Thus, to the extent that I have had to analyze the facts presented by the parties, I have sought not to make definitive findings of fact, but instead to assess the probabilities of the various contentions made by the parties passing muster upon my final adjudication of Kreisler's claim. In contrast, the parties' legal arguments must be evaluated not for the probability that they have merit, but rather for their correctness as a matter of governing law. *In re Thomson McKinnon Securities*, 191 B.R. at 979 (in estimating a claim, court is "bound by the legal rules which may govern the ultimate value of the claim.").

### 2. Severance

■ Unsettled in this circuit is the question of whether severance obligations to employees terminated subsequent to the filing of a bankruptcy petition constitute an administrative expense of the estate. The Second Circuit, in *Straus–Duparquet, Inc. v. Local Union No. 3 International Brotherhood of Electrical Workers (In re Straus Duparquet, Inc.)*, 386 F.2d 649, 651 (2d Cir.1967), a case decided under the old Bankruptcy Act, held that the obligation to make severance payments is incurred upon termination of an employee, and is therefore a postpetition expense of administration. This view was reiterated by the Second Circuit in two subsequent Act cases. *See Zelin v. Unishops, Inc. (In re Unishops, Inc.)*, 553 F.2d 305, 307 n. 1 (2d Cir.1977); *Rodman v. Rinier (In re W.T. Grant Co.)*, 620 F.2d 319, 320 (2d Cir.1980). Under the new Code, however, the Second Circuit has not addressed the issue, and courts are split over whether *Straus–Duparquet* survives.

In *In re Hooker Investments, Inc.*, 145 B.R. 138, 145–46 (Bankr.S.D.N.Y.1992), my

colleague Judge Abram analyzed both the statutory changes and judicial rulings that followed the *Straus–Duparquet* line of cases and concluded that they were no longer controlling. Specifically, she pointed to the limitations that the Code places upon claims arising from employment agreements, *see, e.g.,* Code § 502(b)(7), as indicative of the Congress's effort to regulate the extent to which employee contract claims could recover from the estate at the expense of other creditors. Further, Judge Abram noted that *Straus–Duparquet* was an anomalous result vis-a-vis that in other circuits. Finally, she cited dicta in *Trustees of the Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98 (2d Cir.1986), to support the notion that the Second Circuit itself had moved away from the strict holding of *Straus–Duparquet.* In *Amalgamated,* the Second Circuit expressly declined to disavow *Straus–Duparquet* but seemed to narrow its scope by stating that "it appears to be the general rule that when severance pay ... represents compensation for the employee's past services it is not an administrative expense entitled to priority." *Id.* at 103. Judge Abram concluded her thorough opinion by asserting that the strict rule implied by *Straus–Duparquet* would "wholly defeat[ ]" the "salutary purpose of Code § 365 to give the debtor breathing room to determine whether to assume or reject an executory contract." *Hooker,* 145 B.R. at 150.

Chief Judge Duberstein, my colleague in the eastern district, recently issued a decision in which he disagreed with Judge Abram's conclusion in *Hooker,* and found *Straus–Duparquet* controlling. *See In re Spectrum Information Technologies, Inc.,* 193 B.R. 400, 405–407 (Bankr.E.D.N.Y.1996). Judge Duberstein interpreted *Amalgamated,* which as I have stated expressly did not disavow *Straus–Duparquet,* as an indication that its holding "remains the law of the Second Circuit". *Id.* at 406.

█ Although I consider Judge Abram's decision in *Hooker* the more persuasive, the facts of this case do not require my determination of the continued vitality of *Straus–Duparquet.* While the cases may disagree about whether contractual severance obli-

gations are entitled to administrative priority, it indisputable that a claimant is entitled to a *quantum meruit* recovery for benefit conferred postpetition. *See Hooker,* 145 B.R. at 150 ("... in the absence of actual assumption, the claim is one for *quantum meruit* only.") Thus, no matter the route traveled, we end up with a claim of a higher priority than those of general unsecured creditors. Moreover, under the facts presented here, the best estimate of Kreisler's postpetition claim would appear to be the sum that was negotiated between the parties.

In *Teamsters Local No. 310 v. Ingrum (In re Tucson Yellow Cab Co., Inc.),* 789 F.2d 701 (9th Cir.1986) the Ninth Circuit Court of Appeals was presented with a set of similar material facts. In that case, the debtor, a taxicab company, rejected a collective bargaining agreement with the taxicab drivers' union pursuant to section 1113 of the Code. The drivers continued to work for the debtor subsequent to the rejection of their agreement until a sale of the debtor's assets was completed some eleven days later, at which point their employment was terminated. At issue was whether the drivers were entitled to an administrative expense claim for severance they asserted was owed to them under their now-rejected collective bargaining agreement. The Ninth Circuit Court of Appeals held that although the drivers did not have an express contract, they nonetheless had a *quantum meruit* administrative expense claim for the benefit they had conferred upon the estate. Citing *N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the court found that the rejected collective bargaining agreement was "a fair measure of the value of the services that were rendered during the period that the decision to reject or assume the contract was pending...." *Tucson,* 789 F.2d at 703–04. With regard to severance, the court continued:

No reason appears why the debtor would have paid its employees greater wages than what their work was worth.... If for over fourteen months the fair value was the amount set by the agreement, no reason appears why the work of the last eleven days should be valued at a lower figure.

The debtor, free [prior to the time of rejection] to propose changes in the wages, did not do so. We hold that in quantum meruit the wages owed [at the time of termination] included severance pay as a cost of administering the estate.

*Id.* at 704.

Here, as in *Tucson*, there is a rejected severance agreement negotiated between two commercially sophisticated parties; it is a good benchmark of the value of Kreisler's services.

Nonetheless, without citing *Tucson*, the debtors have advanced two theories as to why the negotiated severance agreement may have been less than fair. First, the debtors claim that Kreisler essentially extorted the severance agreement from them because he refused to meet with certain analysts from Goldman Sachs with regard to a sale of RLW unless he had a severance agreement. This argument would be weightier had Kreisler, in addition to refusing to meet with Goldman Sachs, threatened to beat the members of the debtors' board of directors over the head with a blunt object. The debtors are major corporations with experienced officers and directors. If they believed that Kreisler was not cooperating with their efforts to sell RLW they could have terminated his employment at once and not been liable for any severance payments at all. (See Consulting Agreement, Kreisler Exh. A). They chose not to do that because they recognized the value of Kreisler's continued employment to them, as is evidenced by the severance agreement itself, which states that it was provided to Kreisler in consideration of his contribution to the debtors. (Kreisler Exh. 2).

Second, the debtors attempt to belittle the notion that Kreisler's few months of postpetition employment could possibly be worth the $1,750,000 payment prescribed by the severance agreement. The debtors miss the point entirely.

> The teaching of *Tucson Yellow Cab* ... is that we must look not only to the benefit to the estate, but also to the consideration due the creditor for providing such benefit. Such consideration must encompass the entire bargain between the parties, includ-

ing performance due upon foreseen and bargained for contingencies....

*Teamsters Industrial Security Fund v. World Sales, Inc. (In re World Sales, Inc.),* 183 B.R. 872, 877 (9th Cir. BAP 1995). The severance payment that Kreisler seeks seems expensive if it is viewed solely as remuneration for his performance, because the termination of employment that triggered the obligation also ended his performance. But the present facts do not support the view that Kreisler's severance package was compensation for his past years of service to RLW. The debtors' obligation to Kreisler was not dependent upon his length of service with RLW. The very contract from whence the obligation arose states that he was being provided severance benefits because of the "uncertainty that acquisition discussions always represent." Clearly, the payment due Kreisler fits well into the classic definition of severance pay as "compensation for the hardship which all employees, regardless of their length of service, suffer when they are terminated and [ ] therefore 'earned' when the employee is dismissed." *Amalgamated,* 789 F.2d at 103. As an employee who was earning a very substantial salary, Kreisler obviously was going to suffer a greater pecuniary loss by being terminated than someone who was making less money. Consequently, it is not surprising that the severance agreement he negotiated with the debtors was as generous as it was. This is not to say that a so-called "golden parachute" should be honored through a *quantum meruit* claim. Here, the severance benefit agreed to by the parties was not based upon some enormous figure pulled from thin air. Rather, it was an attempt to approximate Kreisler's total salary for one year, based upon the EBIT achieved by RLW in 1994. Moreover, the debtors' assertion that the agreement was coerced is further undermined by the uncontested testimony of Stuart Kreisler that the amount of severance eventually agreed to among the parties was $250,000 less than he originally demanded. (Testimony of Kreisler, Trans. of 5/8/96 at 49).

It should be noted that in *Tucson* there were strong equitable considerations that seemed to militate against the decision the

court reached. Nonetheless, the court found that equitable principles "necessarily operate within the boundaries set by statute" *id.,* and could not be used to alter the distribution scheme of the Bankruptcy Code. *See also United States v. Noland,* —— U.S. ——, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (equitable considerations cannot be employed in derogation of statutory priority scheme).

All that I've just stated must be tempered by the debtor's assertion that the severance agreement constituted a fraudulent transfer, an issue not relevant to my determination today. I note, however, that based on the evidence presented thus far, I question the strength of that theory because Kreisler was *induced to remain with RLW when his previous agreement with RLW imposed no such requirement on him.*

Because, for the reasons just stated, I find it likely that Kreisler's severance claim will be allowed as a postpetition claim on at least a *quantum meruit* basis, it is unlikely that he will have any prepetition unsecured claim based on his severance agreement. Accordingly, I am estimating the claim based upon that agreement at zero.

In much the same vein as with the fraudulent transfer theory, I need not rule now on the amount of legal fees likely to be owed Kreisler as a result of his collection efforts, since that would only affect the amount of his administrative expense claim. However, I believe that it is unlikely that I would award Kreisler anything that approaches the amount he has requested. In addition to his severance claim, Kreisler has asked for an additional $650,000 he contends is still due him in bonus. That $650,000 claim, rather than the severance claim, is the cause of many of the expenses that Kreisler has incurred, including the extensive litigation regarding the precise figure for EBIT, and the retention of two experts. Moreover, even many of those fees that do not go directly to Kreisler's bonus claim, such as those associated with Kreisler's objection to the Polo sale agreement, are equally unattributable to the severance agreement. Thus, there is little indication that but for his severance claim, Kreisler's legal expenses would have been substantially lower than they are. Finally, I question whether all of Kreisler's efforts in these proceedings were in fact reasonable. For example, it seems to me that Kreisler's unmeritorious motion to disband RLW's committee of unsecured creditors went beyond what was reasonably necessary to enforce his rights against the debtors. In any case, I cannot decide these issues now, particularly in light of Kreisler's failure to provide any documentation whatsoever to support his legal expense claim.

### 3. Calculation of Bonus

■ Most of the evidence presented at the estimation hearing related to the proper amount of Kreisler's bonus. Because the calculation of that bonus derives from EBIT, the parties retained a total of three experts to opine about what that EBIT was. There are two matters at issue with regard to the claimed bonus. First, Kreisler argues that the debtors' calculation should not have included a charge to RLW for its share of the MIS, as discussed earlier. However, it was the uncontroverted testimony of Colin Cooper, currently the chief financial officer of the debtors, that the MIS was fairly allocated among the debtor companies in accordance with accepted practice, and that all charges allocated for MIS were in fact incurred by the debtors. (Testimony of Cooper, Trans. of 5/13/96 at 28). The mere fact that RLW's board of directors, in its business judgment, chose to implement an MIS to which Kreisler was opposed is not a reason to exclude the cost associated with that MIS from the calculation of EBIT.

■ Second, Kreisler contends that the figure from which his bonus is derived should include sales of merchandise booked prior to the sale of RLW but delivered and paid subsequent thereto, which were recovered by RLW pursuant to the terms of its agreement with Polo. That agreement provided that RLW would receive 8.14% of the amount of those sales as a proxy for the EBIT it would have otherwise realized. Kreisler has the better of the arguments. Had there been no asset sale to Polo, the inventory sales at issue would have been posted to EBIT. (See Cooper, 5/13/96 at 29). The asset sale required different accounting treatment of

those sales. *Id.* Nonetheless, the unilateral decision of the debtors to sell the assets of RLW should not affect Kreisler's bonus one way or the other.

■ Thus, the amount likely earned by Kreisler in bonus for 1995 is $536,000, or 15% of the debtor's EBIT, plus $169,000 in bonus earned by Kreisler but not reflected in EBIT, for a total of $705,000. Because the debtor filed its chapter 11 petition in mid-July and terminated Kreisler in mid-October, approximately 68%, or $479,000 of that bonus was earned prepetition, $200,000 of which has already been paid to Kreisler. Accordingly, it is likely that Kreisler has a prepetition claim of $279,000.

It should be noted that the method that Kreisler advocates to allocate his bonus claim between the pre and postpetition period is different from that I have employed. According to Kreisler, his bonus should be deemed earned at the time when the revenue upon which the bonus is based flowed into RLW. Consequently, because the nature of the apparel industry is that the bulk of an entity's income is generated at the end of the year, Kreisler would have me find that over 80% of his 1995 bonus was earned postpetition.

While that result may be a convenient one for Kreisler now, I have rejected it for two reasons: Kreisler's employment agreement provided that he would be compensated *pro rata temporis* in the event of the termination of his employment. Because Kreisler could not control his termination, it is unlikely that he would have placed himself in a position whereby he could be terminated in the first half of a given year and receive a relatively small bonus just because revenue for sales for which he had been responsible had not yet been received. Moreover, it appears that when Kreisler first returned RLW in mid–1993 his bonus was not based upon monthly EBIT, but upon a proportional fraction of RLW's *annual* EBIT. (See Report of Stewart L. Kahn, Kreisler Exh. 14 at Exh. D). Accordingly, my proration is based on time rather than on when payment for sales was received.

*Conclusion*

Kreisler's prepetition unsecured claim is estimated at $279,000.