## In re CITY METALS COMPANY, INC., Debtor.

### Bankruptcy No. 93–30037.

United States Bankruptcy Court, W.D. Missouri.

March 30, 1995.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Lawrence R. Whyte filed a claim in the amount of $1,200,000 in this Chapter 11 bankruptcy case. Pursuant to Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), debtor filed a written objection to the claim. Debtor did not request that Mr. Whyte's claim be equitably subordinated, pursuant to Rule 7001 of the Bankruptcy Rules, and section 510(c) of the Bankruptcy Code (the "Code"). A hearing was conducted on February 23, 1995. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find that the claim of Lawrence Whyte is allowed in the sum of $487,499.97.

### FACTUAL BACKGROUND

Ferromet Resources, Inc. ("Ferromet") was the parent of debtor City Metals Company, Inc. ("City Metals"). Lawrence Whyte was the president and principal shareholder of Ferromet on May 19, 1989, when he sold the company to Clogau Gold Mines, plc ("Clogau"). Subsequently, on June 7, 1989, Mr. Whyte entered into a Service Agreement (the "Agreement") with Ferromet for a term of five years. The Agreement provided that Mr. Whyte would serve as chairman of the board of directors, president, and chief executive officer of Ferromet and its subsidiaries for an annual compensation package of $450,000 per year. Pursuant to the Agreement, Ferromet, its existing subsidiaries, and any future subsidiaries in which Ferromet had voting control were jointly and severally liable for Mr. Whyte's compensation. Additionally, the Agreement provided that Clogau would pay Mr. Whyte $50,000 per year. In the event Clogau failed to compensate Mr. Whyte, Ferromet and its subsidiaries, present and future, were responsible for the $50,000 as well.

Mr. Whyte testified that City Metals was incorporated in the State of Texas on Janu-

Lawrence Pennoni, Houston, TX.

David Schroeder, Springfield, MO, for debtor.

ary 15, 1990, as a subsidiary of Ferromet. He stated it was formed to acquire a foundry, and after two failed attempts debtor was able to acquire the assets of Missouri Precision Castings on June 5, 1991 [1]. Ferromet acquired an eighty-percent share and George Fauverque acquired a twenty-percent share of City Metals. Mr. Whyte was involved in the negotiations to acquire City Metals, and became its president, chief executive officer, and chairman of its board of directors pursuant to the Agreement.

Ferromet was forced into bankruptcy on March 17, 1992. Mr. Whyte testified that he received no compensation after February of 1992, though he continued to provide services to Ferromet and its subsidiaries until his dismissal by the bankruptcy trustee on June 23, 1992. Mr. Whyte sent a letter to City Metals on August 17, 1992, demanding the sum of $1,200,000 pursuant to the terms of the Agreement. City Metals did not respond to this demand.

City Metals was itself forced into bankruptcy on February 12, 1993. The debtor was unable to propose a confirmable plan and on April 22, 1994, this Court approved a liquidating plan to sell City Metals' assets to St. Louis Steel Casting, Inc. Pursuant to the terms of the liquidating plan, the sum of $200,000 is set aside to pay all unsecured claims pro rata.

City Metals objects to Mr. Whyte's proof of claim for the following reasons: (1) it was not a party to the contract, therefore, it has no liability under the Agreement; (2) there was no consideration for the contract; (3) City Metals never ratified the contract; (4) any liability is limited by section 502(b)(7) of the Code.

### DISCUSSION

■ The Agreement provides that issues relating to its validity are to be governed by the laws of the State of Texas. *Id.,* ¶ 12 at pg. 10. In construing a contract and the liabilities of the parties thereunder, the Court must begin with the language of the document itself. When the terms of a document are clear and unambiguous, the parol evidence rule bars any extrinsic evidence to vary, contradict, add to, or explain the unambiguous terms of a written agreement. *Gold Kist, Inc. v. Carr,* 886 S.W.2d 425, 429 (Tex. Ct.App.1994) (citing *Kuper v. Schmidt,* 161 Tex. 189, 338 S.W.2d 948, 952 (1960)). *See also Grundy Nat'l Bank v. Frank (In re Frank),* 103 B.R. 771, 773 (W.D.Va.1989). The general rule in Texas is that absent fraud, accident, or mistake the parol evidence rule prohibits consideration of extrinsic evidence to contradict the terms of an unambiguous, final, and complete writing. *Gold Kist* at 429. *See also Jake C. Byers, Inc. v. J.B.C. Investments,* 834 S.W.2d 806, 811 (Mo.Ct. App.1992). The purpose of the rule is to preserve the sanctity of written contracts. *Jake C. Byers* at 812. The Agreement is a written contract. It initially provides that it is between Lawrence Robert Whyte and Ferromet Resources Inc. (the "Company") together with its wholly and partially owned subsidiaries and joint ventures (the "Group"). Claimant's ("Cl.") Exh. # 2. The Agreement commences on the date of execution and continues for a period of five years. *Id.,* ¶ 7 at pg. 6. The Agreement, executed on June 7, 1989, would have expired on June 6, 1994, without breach. There is no dispute that the term of the contract, as executed, is for a period of five years. There is also no dispute that the Agreement is an employment agreement. The terms of the Agreement, which are unambiguous, cannot be contradicted or varied by extrinsic evidence. *See In re The Charter Company,* 82 B.R. 144, 146 (Bankr. M.D.Fla.1988). City Metals, however, argues that it was not a party to the Agreement, and, thus, cannot be bound by its terms because City Metals had not been incorporated on the date the Agreement was executed.

■ The Agreement provides that:
Should the Company or the Group acquire in whole or in part by any manner, including joint venture, additional subsidiaries, directly or indirectly . . . to the extent the Company or the Group or any combination thereof shall have voting control, directly

---

1. Missouri Precision Castings had filed a Chapter 11 bankruptcy and its assets were under the protection of this Court at the time of the purchase.

or indirectly to elect at least one director and voting control, directly or indirectly, to control the election of officers, the Executive shall immediately be appointed as the Chairman of the Board of directors and the Chief Executive Officer of each such company with full responsibility of and authority for managing all of their operations, current and future, for the remainder of the term of this Agreement and each such additional company shall be included within the definition of "Group."

*Id.*, ¶ 1 at pg. 1. It is undisputed that Mr. Whyte was the chief executive officer of Ferromet at the time City Metals was formed. He is listed as one of two directors in the Articles of Incorporation of City Metals. Deb.'s Exh. # 4. The Asset Purchase Agreement which transferred the assets of Missouri Precision Castings, Inc. to City Metals was between Ferromet and J. Kevin Checkett, Trustee in Bankruptcy for Missouri Precision Castings, Inc. Deb.'s Exh. # 1. Said agreement provides that Ferromet purchased eighty-percent of Missouri Precision's assets and George Fauverque and Benjamin Rosenburg received a twenty-percent ownership interest. *Id.* All of the documents relating to said asset sale were signed by Scott Breimeister, Senior Vice President of Ferromet. Mr. Breimeister testified that at all times he operated under authority delegated to him by Mr. Whyte. Mr. Checkett testified that he was aware that Mr. Whyte was the ultimate decision maker during the negotiations for the asset purchase. The Agreement is clear and unambiguous that the parties intended the contract to bind later acquired subsidiaries provided Ferromet maintained voting control. I find that, with an eighty-percent ownership interest in City Metals, Ferromet had voting control and could and did control the election of officers. I further find that the Agreement applies to City Metals as an after-acquired subsidiary of Ferromet.

City Metals next argues that City Metals never ratified the Agreement. Under the laws of the State of Texas acquiescence is evidence of ratification. *Simms v. Lakewood Village Property Owners Ass'n, Inc.*, 895 S.W.2d 779 (Tex.Ct.App.1995) (citing *Jamail v. Thomas*, 481 S.W.2d 485, 490 (Tex.Ct.App. 1972)). Ratification which may be express or implied, occurs when a party recognizes the validity of a contract by acting under it or affirmatively acknowledging it. *Zieban v. Platt*, 786 S.W.2d 797, 802 (Tex.Ct.App.1990). *See also Petroleum Anchor Equipment v. Tyra*, 419 S.W.2d 829, 834 (Tex.1967); *Jamail* at 490; *Wetzel v. Sullivan, King & Sabom*, 745 S.W.2d 78, 71 (Tex.Ct.App.1988); *Diamond Paint Co. of Houston v. Embry*, 525 S.W.2d 529, 535 (Tex.Ct.App.1975). City Metals accepted the services of Mr. Whyte as its president, chief executive officer and chairman of its board of directors from the time of its incorporation until his dismissal in Ferromet's bankruptcy. Mr. Whyte testified that he was actively engaged in seeking additional financing for City Metals until his dismissal. Mr. Breimeister testified that Mr. Whyte made all the major decisions. There was no testimony to dispute Mr. Whyte's claim that the board of directors of City Metals was at all times under his control until June 23, 1993, when he was dismissed by the bankruptcy trustee appointed in Ferromet's bankruptcy. I find that the Agreement was impliedly ratified by City Metals because the company acquiesced to the leadership of Mr. Whyte and acted under the Agreement he entered with Ferromet. I also find that Mr. Whyte performed services for City Metals during the course of his employment in consideration of City Metals obligations under the Agreement. For all of the above reasons, I find that City Metals is bound by the terms of the Agreement.

Having found that City Metals is bound by the terms of the Agreement, I will next address the measure of damages.

The Agreement states:

For services rendered hereunder, the Executive shall be compensated by the Company and the Group, responsible jointly and severally, at a minimum rate of US$350,000 per annum during the continuation of this Agreement plus benefits and/or cash ... equal to US$100,000 per annum ... provided that should the Executive not be paid at least 30,000 British Pounds per annum by Clogau under the Service Agreement during each year of the

initial term of this Agreement, the Company shall pay the Executive ... the difference between (i) US$50,000 and (ii) the amount, if any, paid to the Executive [by Clogau].

*Id.,* ¶ 1 at pg. 2. Mr. Whyte testified that he continued to provide services for Ferromet and its subsidiaries until he was officially terminated by the trustee in Ferromet's bankruptcy on June 23, 1992. However, Mr. Whyte stated that he received no compensation from Ferromet after February of 1992, and no one disputed that testimony. Mr. Whyte, therefore, claims he is entitled to compensation from any and all of the subsidiaries of Ferromet to compensate him for the twenty-seven months remaining on the Agreement. He has received one payment in the sum of $25,000 from Techmet, Inc., a subsidiary of Ferromet.

■■■■ City Metals argues that any damages are limited by section 502(b)(7) of the Code. Section 502(b)(7) provides:

> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition ... except to the extent that—
>
> .    .    .    .    .
>
> (7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—
>
> (A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
>
> (i) the date of the filing of the petition; or
>
> (ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus
>
> (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

11 U.S.C. § 502(b)(7). There is no dispute that Mr. Whyte's claim is a claim for damages resulting from the termination of the employment contract he executed with Ferromet. For purposes of section 502(b)(7) Mr. Whyte's damages are, therefore, limited to one year from the date of Ferromet's bankruptcy petition filed March 17, 1992, plus any unpaid compensation on that date. *See, In re Hooker Invest. Inc.,* 145 B.R. 138, 151 (Bankr.S.D.N.Y.1992); *In re Murray Industries, Inc.,* 114 B.R. 749, 752 (Bankr.M.D.Fla. 1990), *aff'd,* 147 B.R. 597 (M.D.Fla.1992); *In re The Charter Co.,* 82 B.R. 144, 147 (Bankr. M.D.Fla.1988). Ferromet terminated the Agreement, and the damages under the terminated Agreement are capped by the provisions of section 502(b)(7). Mr. Whyte cannot recover from any of Ferromet's subsidiaries under a theory of joint and several liability an amount in excess of that he would have been able to recover from Ferromet. *See generally Levinson v. LHI Holding, Inc. (In re LHI Holding, Inc.),* 176 B.R. 255 (M.D.Fla.1994). Mr. Whyte's proof of claim for $1,200,000 is based upon an annual compensation package of $500,000. He has included the $50,000 Clogau is obligated to pay for the twenty-seven months remaining on the contract. However, Mr. Whyte negotiated a Retirement Agreement with Ferromet Group plc, successor-in-interest to Clogau, on August 3, 1992. Deb.'s Exh. # 6. Pursuant to the Retirement Agreement, Mr. Whyte and Ferromet Group plc released each other from any claims provided that Mr. Whyte's salary was paid up to the date when the Retirement Agreement was approved by Ferromet Group plc at its general meeting not later than October 31, 1992. *Id.,* ¶¶ 1.2, 2.0, and 2.2 at pages 1–3. No evidence as to when Ferromet Group plc approved the Retirement Agreement was offered, though Mr. Whyte did testify that it was approved. Therefore, for purposes of determining the compensation to which Mr. Whyte is entitled, I find that Ferromet Group plc paid Mr. Whyte $50,000 per annum through October 31, 1992. Mr. Whyte's claim is calculated as follows: (1) Mr. Whyte is allowed $18,750.00 as unpaid compensation from March 1, 1992 through March 16, 1992, the day prior to the filing of Ferromet's bankruptcy petition; (2) section 502(b)(7) of the Code limits the claim to an additional $500,000, Mr. Whyte's compensation for one year following such filing;

and (3) City Metals is entitled to reduce the claim by the $31,250.03 which Mr. Whyte received from Ferromet Group plc from March 17, 1992, through October 31, 1992. For the reasons stated above, Mr. Whyte's claim is allowed in the sum of $487,499.97.