**In re RALPH LAUREN WOMEN-SWEAR, INC., now named Bidermann Womenswear Corp., Debtor.**

**Bankruptcy No. 95 B 43100 (TLB).**

United States Bankruptcy Court, S.D. New York.

Jan. 9, 1997.

As Amended Jan. 21, 1997.

Stroock & Stroock & Lavan by Jay R. Fialkoff, Curtis C. Mechling, Alan Z. Yudkowsky, Brian M. Cogan, New York City, Applicant Pro Se.

Bondy & Schloss L.L.P. by James R. Kahn, New York City, for Stuart L. Kreisler.

## DECISION ON MOTION TO ENFORCE CHARGING LIEN

TINA L. BROZMAN, Chief Judge.

Stroock & Stroock & Lavan ("Stroock") asks me to declare and enforce a $510,000 attorneys' charging lien on the settlement proceeds of Stuart L. Kreisler's claim against this estate. Kreisler does not dispute the validity of Stroock's lien, the overall quality of Stroock's work, or the $2 million settlement Stroock obtained on his behalf. Rather, Kreisler contends that Stroock did not manage or supervise its staff and experts efficiently and is therefore not entitled to full payment. At the end of the representation,

Kreisler requested of Stroock a 25% discount off the total of all bills, including those of experts retained on his behalf with his consent. He asked this, he says, because of his belief that large law firms give discounts and also because he promised to continue to use Stroock's services for future matters. He reasoned that since his bonus and severance benefit resulted in a large personal tax liability, he ought be granted the discount. Notably, Kreisler did not base his request on any promises made to him during the representation. When Stroock declined to grant the discount and negotiations for a consensual resolution broke down, Stroock filed this motion seeking to collect fees from the proceeds on behalf of itself and the two experts. Kreisler has agreed to adjudicate the matter in this court and to treat Stroock's motion as an adversary proceeding.

## I.

Stroock represented Kreisler, the former president and chief executive officer of Ralph Lauren Womenswear ("RLW"), in numerous matters in this bankruptcy proceeding, most of which pertained to his employment agreement and his pursuit of a severance award. Kreisler advocated the position that because of his postpetition termination when RLW was sold he was entitled to an administrative claim for the whole of his $2.2 million severance benefit and bonus (and his substantial legal costs in pursuing this claim). On the other hand, RLW and its corporate parent, Bidermann Industries, Inc. ("Bidermann" or collectively "the debtors") insisted that Kreisler was entitled only to an unsecured, prepetition claim which ought be avoided as a fraudulent conveyance. The official committee of unsecured creditors also asserted that Kreisler had received voidable preferences within one year of the petition date. The matters were interrelated, bottomed as they were on the validity of Kreisler's claim.

### A. *Background*

Kreisler's relationship with Daniel Golden dates back to 1979, when Golden, then an associate at another law firm, performed legal services for Kreisler's insolvent company. In early July 1995, when Kreisler became concerned about the imminent bankruptcy of his employer, he communicated with Golden, who was by this time a partner at Stroock. RLW requested Kreisler to consent to recharacterize his written agreement to one for employment rather than consulting. Kreisler was concerned about the impact of chapter 11 on his severance and bonus rights. In response to Kreisler's request for assistance, Golden dictated a letter for the companies to sign which would protect Kreisler against negative consequences of the recharacterization. Golden did not charge Kreisler for his advice or preparation of the letter.

### B. *Stroock's Services*

After RLW and Bidermann filed for chapter 11 relief, Kreisler retained Stroock. Stroock did not request a retainer nor Kreisler's execution of a retainer/engagement agreement. Golden had primary responsibility for Kreisler's engagement.

Golden informed Kreisler at the outset that he would need to retain an executive compensation expert to opine on the reasonableness of his severance and bonus benefits. On the legal side, Stroock endeavored to demonstrate that Kreisler was entitled to administrative expense priority for his claim. To protect Kreisler in the event he proved successful on his administrative claim, Stroock negotiated a reserve from the debtors' sale of the RLW assets. Hedging its bets, Stroock also filed an unsecured claim for the full amount. When the debtors sought to reject Kreisler's agreement after the sale, Stroock counseled Kreisler. In addition, believing that Kreisler's rights as a potential RLW unsecured creditor were not being adequately represented by the Bidermann–RLW official committee of unsecured creditors, Stroock moved to appoint an examiner. Kreisler was aware that the legal costs associated with the examiner motion might not be reimbursable from RLW under the terms of his agreement. Stroock also performed legal research on the liability of the debtors' officers and directors.

Seeing the mounting costs, I sent the Kreisler matter to mediation, which was not successful. Stroock then began preparing for trial on the administrative claim. The

debtors had another idea, however. They moved to estimate the unsecured aspect of Kreisler's claim since confirmation of RLW's plan was imminent and Kreisler might have a swing vote if his claim were unsecured. Because the issues surrounding the merit of Kreisler's administrative claim were the converse of the merit to his unsecured claim, Stroock and Kreisler geared the estimation litigation accordingly. All the matters were vigorously contested, requiring discovery, depositions, numerous court conferences, a valuation hearing, and extensive negotiations among Kreisler, the debtor, the institutional lenders, and the official committee of unsecured creditors, all of whom were represented by sophisticated counsel. The estimation hearing lasted two days. The decision which I issued on the estimation motion itself required analysis. And the ultimate settlement of the dispute required extensive negotiations which I observed in part myself, having assisted the parties to resolve their differences.

Stroock's extensive services are catalogued in the monthly billing statements it had sent to Kreisler which detail each service performed and the time spent on each matter. Exs. 1–10. Stroock's time records were also submitted into evidence. Ex. G.

## C. The Fees Sought

After a few months, Golden sent Stroock's first bill to Kreisler for services rendered through September 30 and requested that it be paid by year-end. Ex. 1. Kreisler paid the entire bill, which encompassed legal fees of $60,000 and expenses of $3,120.58. Unbeknownst to Kreisler, Golden had reduced the legal fees to $60,000 from $84,000, the difference representing the time Stroock needed to get itself "up to speed" on the Bidermann bankruptcy case. R. 77–80. Golden said he reduced the fees because he considered Kreisler a friend, but did so secretly because he did not want Kreisler to expect a discount off future bills. He also omitted from Stroock's first bill the hourly rates of the attorneys providing services to Kreisler so that Kreisler could not determine that the fees were discounted.

Stroock's legal bills were as follows:

| Ex | Service Period | Bill Sent | Fees | Expenses | Fees & Exp. Cumulative Total |
|----|---------------|-----------|------|----------|------------------------------|
| 1 | 8/18/95—9/30/95 | Oct. 18, 1995 | - $60,000.00 | $ 3,120.58 | $ 63,120.58 |
| 2 | 10/01—11/30 | Dec. 12, 1995 | 42,257.50 | 2,839.84 | 108,217.92 |
| 3 | 11/03—12/31 | Jan. 22, 1996 | 28,117.00 | 3,591.44 | 139,926.36 |
| 4 | 1/02/96—1/31/96 | Mar. 14, 1996 | 9,741.00 | 281.61 | 149,948.97 |
| 5 | 2/01—2/29 | Mar. 14, 1996 | 50,742.00 | 1,793.56 | 202,484.53 |
| 6 | 2/26—3/30 | Apr. 9, 1996 | 58,715.50 | 6,034.46 | 267,234.49 |
| 7 | 4/01—4/30 | May 13, 1996 | 74,134.00 | 9,733.91 | 351,102.40 |
| 8 | 5/01—5/31 | June 13, 1996 | 81,732.50 | 10,915.89 | 443,750.79 |
| 9 | 6/02—6/30 | July 15, 1996 | 23,917.50 | 5,187.04 | 472,855.33 |
| 10 | 7/02—7/31 | Aug. 6, 1996 | 25,138.50 | 2,374.30 | 500,368.13 |

Exs. 1—10. Stroock's subsequent billing statements identified the service period, contained brief descriptions of the services rendered per day and per attorney, and identified the hourly rate of each person providing services on Kreisler's behalf. The expense portion of the statements contained categories of expenses and the total disbursements for each category.[1]

In March, when Stroock and Kreisler decided to shift into high gear for the estimation hearing, Stroock counseled Kreisler to engage Kahn Consulting, Inc. ("Kahn") to opine on the reasonableness of his severance and bonus and Buck Consultants ("Buck") to opine on the reasonableness of the severance agreement. Kreisler understood that he was responsible for payment and gave a $10,000

1. The experts' bills were not included on      Stroock's statements.

retainer to Kahn, though Stroock formally retained both experts. Golden Repl.Decl. ¶ 8 at 6. On April 3, 1996, Kahn billed Stroock $13,469.30 for services rendered through March 31, 1996. The bill identifies the person who performed the services, his or her hourly rate, and the number of hours expended, as well as the dollar amount of expenses incurred. Ex. F. Kahn continued to bill Stroock for its services and, by early May, had issued bills for services rendered aggregating $50,000. Kahn did not bill Kreisler directly although Kreisler reviewed Kahn's bills in Stroock's offices at some point in early May. On July 11, 1996, Kahn prepared a summary of fees for its engagement through and including May 31, 1996, which was broken down by individual and area of work. Ex. J. It reflected that the total bills including expenses aggregated $82,094.

Buck Consultants ("Buck"), the other expert retained by Stroock, billed Stroock $21,-424 on May 6, 1996, and $27,945 in late June. Exs. C, D. The bills do not reflect how the fees were calculated or how many persons had performed services, how many hours had accrued, or the hourly rate of any service provider. The only information the bills contained was the service period and the total amount of the bill. Claudia Poster of Buck had not asked Kreisler for a retainer nor did she inform him of her $368 hourly rate or of how Buck would bill for its services. Testimony of Poster, R. 156–157; Testimony of Kreisler, R. 195. Stroock was also unaware of how Buck Consultants billed for its services. Testimony of Golden, R. 82–83. At no point, even after Stroock received the first bill for $21,424 on May 6, did Stroock inquire as to how many employees were working on Kreisler's matter or how many hours Buck was incurring on Kreisler's behalf. *Id.* Stroock also did not inquire as to how the total fee was calculated. Stroock did not forward the first bill to Kreisler (and he did not see it until this motion was made).

At the hearing on this motion, Poster testified that Buck calculated the bills by multiplying the consultant's hourly rate by the number of hours. She also testified that she delegated significant work to less expensive consultants. For some reason, Golden was unaware of the earlier May bill and referred in his August 6 letter to Kreisler accompanying his own final bill to Buck's second bill as the "first and final" Buck invoice. Stroock did not demonstrate that it ever sent Buck's May bill to Kreisler before it filed this motion.

### D. *The Estimates Furnished Kreisler*

Kreisler testified that although he could not remember the date, in early 1996 when bills started to come in on a regular basis Golden estimated the cost of the representation at $250,000 with experts. R. 178–183. Golden denies that he ever gave Kreisler an estimate of fees and expenses through the end of the case. R. 60. In any event, by early March, when legal bills from Stroock through December totalled $140,000, Kreisler had paid only the first of Stroock's bills. Golden told Kreisler that he needed to become current. Kreisler responded that he was working on a personal transaction which would generate sufficient cash proceeds to enable him to pay Stroock's then unpaid bills totalling $76,805.78. Kreisler testified that when he had this conversation with Golden, he fully intended to pay Stroock's fees up to that date with the proceeds from a transaction which was set to close on April 15. Testimony of Kreisler, R. 241, 254. Golden followed up on the conversation by sending copies to Kreisler of all Stroock's previous unpaid statements plus Stroock's January and February statements. Exs. 2–5. Kreisler did not object to any of the bills or to the services being provided.

In early February, John Cherpok, a consultant from Kahn, wrote to Randy Shapiro, an associate from Stroock's litigation department, and estimated Kahn's fees as $22,500 for specified analytical services "provided all necessary information is available." Ex. I. The letter expressly noted that the estimate did "not include the preparation of any expert report or preparation for testimony." Ex. I. Stroock did not forward this letter to Kreisler. In early March, Cherpok sent Brian Cogan, the partner from Stroock who headed up this aspect of the case, an engagement letter which outlined Kahn's intentions, billing practices, and required retainer. *See*

Ex. E. Stroock sent it along to Kreisler. *See* Ex. E first page. Stroock, Mr. Kahn, and Cherpok met with Kreisler, Kreisler assuring them that he was responsible for and would pay Kahn's bills, though Stroock formally retained Kahn. Kreisler recalls it was then explained to him that he had to pay all of Kahn's bills by the time Mr. Kahn testified. Although Mr. Kahn asked for a $20,000 retainer, Kreisler negotiated a $10,000 one and paid it via Stroock on April 1. *See* Testimony of Cherpok, R. 125; Ex. H.

Shapiro called another expert, Buck, and initially asked it to provide an analysis and opinion on the reasonableness of Kreisler's severance agreement. Testimony of Poster, R. 155. Shapiro met with Claudia Poster, a compensation consultant, who informed Shapiro that although it was difficult to estimate she hoped the fees would not exceed $20,000. Ex. K; R. 156. By letter dated March 19, 1996, Poster requested a $10,000 retainer. Ex. K. Poster testified that she prepared the original $20,000 estimate under the assumption that Buck would be an expert compensation witness on the severance aspects of the agreement only, so that the bonus related issues were not contemplated in her original estimate. Testimony of Poster, R. 162; Ex. K. Shapiro told Poster that Buck would have to meet with Kreisler to "finalize the engagement," testimony of Poster, R. 157, and later that month they did so. Buck's estimate was communicated to Kreisler. Testimony of Kreisler, R. 196.

Later in March, in contemplation of the estimation hearing, Cogan estimated "the costs" at $350,000. Testimony of Kreisler, R. 184. It is not clear what Cogan intended or what Kreisler perceived this estimate to cover. On April 9, Golden sent a letter accompanying Stroock's March bill reminding Kreisler that Golden was "taking a lot of heat with respect to the outstanding prior balance." By this point, Kreisler had received bills from Stroock aggregating just over $200,000 for services rendered through February. As it turns out, the personal transaction which Kreisler contemplated would enable him to pay Stroock its outstanding balance fell through. Around this time, the parties began a series of discussions about the unpaid fees. Not once, however, did Kreisler object to the bills or to any service being performed on his behalf. Instead, Kreisler informed Golden sometime in either April or May that he was working on another transaction which would generate some $200,000 in cash on June 15th, at which time he would pay Stroock. Testimony of Golden, R. 47; Testimony of Kreisler, R. 186, 241–243. The unpaid balance at this time was $204,000. Once again, though he promised to pay Stroock's accrued fees, Kreisler had nothing to say about the size of the bills or the particular services being performed on his behalf.

In preparation for a mid-April meeting with Kreisler and his attorneys, Kahn prepared an estimate of its total fees "prior to trial preparation" at $55,000. Ex. 13. It gave this chart to Shapiro, who showed it to Kreisler. Testimony of Cherpok, R. 130. Kreisler reviewed Kahn's bills in early May and thereafter paid Kahn $50,000. Testimony of Kreisler, R. 189–190. Kreisler testified that he expressed his discomfort with $50,000 to both Shapiro and Golden, Testimony of Kreisler, R. 189, but paid the sum on May 6 because Golden assured him that Kahn's testimony would be beneficial and because Shapiro insisted that Kahn be paid prior to trial. Kreisler testified that he believed the aggregate $60,000 he had paid Kahn already would cover the cost of Kahn's testimony at the estimation hearing. However, Kreisler admitted that he had no basis for that belief. R. 218, 219.

Kreisler realized that Cogan's $350,000 estimate was inadequate in May after the parties had submitted briefs for the estimation hearing. Part of Kreisler's claim was for attorneys' fees pursuant to his contract. Stroock's papers in response to the motion requested reimbursement for legal fees of $450,000. At the time those papers were filed, Kreisler had received Stroock's bills through March 30 which cumulated only $268,000. He reasons, therefore, that he had no impetus to object to the fees because the bills were coming in under budget. Testimony of Kreisler, R. 186–187. However, Kreisler had received bills only through March and it was May already, with a heavily con-

tested estimation hearing on the forefront. If Kreisler were relying on the $450,000 figure to represent all fees and expenses through the end of the case (not just through May), he could not have relied solely on Stroock's bills through March to be assured the fees were coming in "under budget." He had to have known that he would be billed for April and May's services as well.

At the onset of the estimation hearing, Kreisler began telephoning Stroock's offices nearly every day. Testimony of Golden, R. 35. He and his counsel regarded the estimation hearing as critical. As he testified, if he failed at that stage, he was likely to change course dramatically and perhaps abandon his claim. R. 184. If Kreisler estimated the April bill at $60,000 (a reasonable estimate based on the prior bills) and May's bill at $70,000, he would have had to have added those amounts he had already paid to Kahn ($60,000) and the estimated Buck fees ($20,-000), plus an estimate for Kahn's fees for trial ($10,000) to determine the total fees. Given the size of the monthly fees, if Kreisler believed he was being over-charged he certainly had the impetus to object.

The next significant event occurred in early June when Kreisler spoke to David Simonds, an associate from Stroock's bankruptcy department, who estimated that under the "best case," legal fees totaling $500,000 would be reimbursed by the estate as an administrative expense. Ex. O (dated June 7, 1996); Testimony of Kreisler, R. 209. Kreisler then inferred that the legal fees, stated at the estimation hearing to be $450,-000, could go to up as much as $500,000.

When all was said and done, Stroock had billed Kreisler a total of $500,368.13 for expenses and services rendered from August 1995 through July 1996. Stroock also requests fees of $1,330.09 for its August 1996 services although it did not bill Kreisler for this amount before it filed this motion. Kahn had billed $82,094 and Buck had billed $49,-379. Thus, the total fees and expenses accrued on Kreisler's behalf was $633,171.22.[2]

Golden defended the decision, with which Kreisler concurred, to engage two experts.

Golden testified that Buck was to opine at the estimation hearing on the compensation payable to Kreisler "generally," that is, on the appropriateness of his level of compensation for the marketplace. R. 81. Kahn was to testify as to the value of Kreisler's services to the estate.

Explanations were furnished as to the reasons why the two experts' bills exceeded their estimates. Cherpok testified that one of the reasons why Kahn's bill was high was that many of the documents needed to prepare the firm's analysis were not provided by the debtors, forcing Kahn to reconstruct the information through an extensive interview process with various individuals. In addition, Kahn was required to sort through some twenty or so boxes to find relevant documents. Then, when the "actuals" were delivered, Kahn had to redo a substantial portion of the work on the eve of the estimation hearing. Poster testified that she was originally only to opine on the severance aspects of Kreisler's claim but that her engagement was expanded later to include the bonus as well. Stroock produced no evidence that Kreisler was informed of the augmented services. Poster attended both trial days of the estimation hearing although she never testified. She was informed that the parties would not be using her live testimony so they had her testify at a videotaped deposition with the expectation that it would become part of the record of the estimation hearing. Testimony of Poster, R. 158–160. Poster explains that she had to answer questions at the videotaped deposition over objection so that if it were determined that she had to answer, her answer would be on record. She testified that this procedure was extremely time consuming. In addition to Buck's time for this exercise, Stroock billed Kreisler $6,215 for the post-hearing deposition of Poster as well. Ex. G, pages S 0145—0147.

Golden refuses to assume responsibility for the size of the experts' fees, suggesting that if "Kreisler has a problem with the experts in the case, he ought to take it up with them." Golden Repl.Decl. ¶ 8 at 6. Golden's conten-

---

**2.** Even though Kahn billed a total of $82,094, Stroock's motion seeks payment for a total of

$81,795 for Kahn's services. The reason for the difference was not explained at the hearing.

tion is troubling as to Buck. Kreisler retained the experts on the advice of Stroock, and Stroock directed their work. Stroock neglected to obtain detailed bills from Buck and to timely send them to Kreisler, effectively removing Kreisler from control. If Kreisler was to monitor Buck, as Golden argues, Stroock should have given him the tools to do so. The situation with Kahn was different, for Kreisler was kept much more apprised of what Kahn was doing and how much it cost.

### E. *The Estimation Hearing*

After the parties submitted evidence at the estimation hearing, I determined that the bulk of Kreisler's claim was most likely an administrative one. *See In re Ralph Lauren Womenswear, Inc.,* 197 B.R. 771 (Bankr. S.D.N.Y.1996). In view of the unsettled state of the law, this was a great victory which Stroock achieved. Kreisler testified that after the issuance of this decision he first complained to Golden about the fees. R. 207–208, 246. He says that he asked Golden for a discount and Golden responded that Stroock would not discount the fees, but would discuss the bill with Kreisler at any time he wanted. R. 212; R. 250. Kreisler testified that he replied to Golden, "when we get to the end, I'll come in." R. 212. Golden denies that this conversation took place or that Kreisler objected to the fees at any point before early August. In any event, the parties agree that Kreisler objected to the magnitude of the fees before he received the final bill in August.

### F. *The Settlement*

After the estimation hearing, Kreisler negotiated with the senior lenders a settlement of his claim for $1.8 million. Kreisler asked to have the settlement agreement provide that some of the recovery represented compensation for damage to his character, which, perhaps, would have entitled Kreisler to more favorable tax treatment on the whole of the settlement. Ex. M; Testimony of Kreisler, R. 35; Testimony of Golden, R. 200.

Because no tort claim was pleaded, the parties abandoned the allocation idea. In light of the large tax consequences to Kreisler, the parties renegotiated the settlement.

Kreisler received Stroock's final bill in early August. It included all of Stroock's previous bills and all of the experts' bills, with the exception of the first $21,474 Buck invoice. Kreisler was outraged when he received the final bills reflecting fees and expenses of more than $600,000. Kreisler met Golden in Stroock's offices to discuss the matter and requested the 25% discount mentioned earlier. R. 49.

In the meantime, the litigants had agreed upon a $2 million settlement. Kreisler met again with Golden and urged Stroock to discount the bills. On August 12, Golden informed him that Stroock would not discount the bills but would withdraw the motion to approve the settlement if Kreisler were unsatisfied with the amount. Testimony of Kreisler, R. 252. Kreisler declined. *Id.* The next day I approved the settlement agreement.

The initial draft of the settlement agreement had provided that the debtors were to send the money directly to Kreisler; Stroock changed it to direct that the money was to be sent to Stroock as counsel for Kreisler. Testimony of Golden, R. 79. Golden justified this to Kreisler as being common practice regarding settlement proceeds. Kreisler then executed the settlement agreement. Stroock received the $1,236,312.60 proceeds (net of taxes) from the debtors on August 15, 1996. After another unsuccessful conversation about discounting the bill, Stroock remitted $747,994.96 to Kreisler. Stroock retained $488,317.64, which Stroock contends represents the remaining unpaid fees and expenses of Stroock and the experts.[3] Stroock also seeks to enforce its charging lien against the proceeds for an additional $21,434 representing the amount of Buck's first bill. Stroock is not holding this sum. Adding to these sums the $63,120 which Kreisler had paid Stroock and the $60,000 which he had

---

**3.** Stroock calculated the holdback of $488,317.64 as follows: Stroock's unpaid billed fees of $437,247.55, Stroock's unbilled fees and expenses of $1,330.09 for August, Kahn's unpaid fees of $21,795, and Buck's second bill for $27,945.

paid Kahn, the total fees charged Kreisler were $632,871.64.

## G. *Kreisler's Specific Objections*

At the charging lien hearing, Kreisler pointed out errors in expense disbursements that Stroock had charged to Kreisler's account. Golden billed two cab rides, totaling $61.57, to Kreisler in error. Testimony of Golden, R. 114. Randy Shapiro from Stroock's office billed Kreisler $33.67 for a cab ride home from the office when she spent only ½ hour of time on Kreisler matters that day. R. 116; Ex. G, page S 0164, S 0712. Golden billed Kreisler $19 for a cab ride from Golden's home to Stroock's offices at 9:06 in the morning. R. 117, Ex. G, page S 0055. As to legal matters, Stroock erroneously billed Kreisler $837.24 for legal research on attorneys' charging liens. All of these charges are inappropriate and Stroock has agreed to reduce its fees for these amounts.[4]

Kreisler complains that Stroock over-staffed matters, citing as an example Stroock's billing him for the presence of three Stroock attorneys at each day of the estimation hearing even though Stroock did not expect all three to be examining witnesses. Stroock billed Kreisler as follows: On May 8, David Simonds, 6 six hours for $1,410; Randy Shapiro, 10.5 hours for $2,625; Brian Cogan, 9 hours for $3,348; on May 13, Danny Golden, 5 hours for $2,259; Randy Shapiro, 11.8 hours for $2,950; Brian Cogan, 10.2 hours for $3,672. (Ex. G, pp. S 0138, 0141). As I know from the numerous discovery conferences, Shapiro was intimately involved with discovery and was better versed in some of the details than Cogan. If Kreisler suggests that both Cogan and Shapiro were unnecessary, he does not offer any explanation as to why he did not complain about that at the hearings. The rationale for the attendance of either Golden or Simonds is less compelling, however. Golden testified that either he or Simonds was present in case any questions of "pure" bankruptcy law arose, Cogan and Shapiro being bankruptcy litigators. This sounds as though Cogan is

thought to be a novice in the bankruptcy arena, which he plainly is not. Had a question arisen which he could not answer, which was unlikely because the legal issues had been briefed already, Shapiro could certainly have called Golden. But I doubt the necessity of his or Simonds' attendance at the estimation hearing.

## II.

### A. *Jurisdiction*

■■■ Although both parties consent to my ability to resolve Stroock's motion, I reach the issue of jurisdiction nonetheless because one of my colleagues on this court has ruled that jurisdiction to determine and enforce a charging lien is lacking in circumstances which are not distinguishable from those now facing me. *In re Gucci*, 193 B.R. 417 (Bankr.S.D.N.Y.1996) (Gallet, B.J.); *Schacter v. Elghanian (In re West 57th Street Concrete Corp.)*, 1996 WL 706931 (S.D.N.Y. 1996) (aff'g Gallet, B.J.; *but cf. Pan Am. World Airways, Inc. v. Care Travel Co. Ltd. (In re Pan Am. Corp.)*, 166 B.R. 538 (S.D.N.Y. 1993). All agree that Stroock's request falls under the rubric of an attorneys' charging lien and that "[a]n attorney representing a creditor in a bankruptcy proceeding has a judicially enforceable section 475 lien upon the fund allocated to the payment of his client's claim," *Gordon v. Shirley Duke Assocs., A.P.I. (In re Shirley Duke Assocs.)*, 611 F.2d 15, 18 (2d Cir.1979) (Act case, applying New York law). The question is whether I may enforce it. The lien created by section 475 "is enforceable in federal court in accordance with its interpretation by New York Courts." *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 67 (2d Cir.1991). The bankruptcy court has jurisdiction over the enforcement of this lien because the proceeds of the settlement are from the debtor's estate and because the bankruptcy court has jurisdiction over the original dispute which gave rise to the lien. *See Pan Am. World Airways, Inc. v. Care Travel Co. Ltd. (In re Pan Am. Corp.)*, 138 B.R. 382 (Bankr. S.D.N.Y.1992), *aff'd in part, vacated in part,*

---

4. In addition, upon my own review of Stroock's time records, it appears that Stroock charged Kreisler for fees incurred in attempting to get the estimation decision published. Ex. G, page S 0164 ($416). This charge is unjustified.

166 B.R. 538 (S.D.N.Y.1993) (reversed and remanded to bankruptcy court insofar as bankruptcy court determined that judgment upon which attorney claimed charging lien was not a final order); *Shirley Duke,* 611 F.2d at 18; *Triskett Ill., Inc. v. Dixon (In re T.C. Assocs. Ltd. Partnership),* 163 B.R. 140, 142–145 & n. 6 (Bankr.N.D.Ill.1994) (determining that validity of creditor's counsel's alleged charging lien is a core matter); *In re Pathe News, Inc.,* 276 F.Supp. 670, 673 (S.D.N.Y.1967) (Act case) ("since the services which gave rise to the lien were performed in the Chapter XI proceedings the Bankruptcy Court in which such proceedings are still pending is best qualified to pass on such services and to fix reasonable value if that be necessary").

In *Shirley Duke,* the only bankruptcy charging lien case upon which *Gucci* relies, a creditor's counsel attempted to invoke bankruptcy court jurisdiction to enforce a purported attorneys' charging lien upon the financing that his client and his client's partner had obtained. *Gordon v. Shirley Duke Assocs. (In re Shirley Duke Assocs.),* 611 F.2d 15 (2d Cir.1979) (Act case). The *Shirley Duke* Court began:

> As a general rule, a bankruptcy court has no jurisdiction to decide controversies between third parties which do not involve the debtor or his property, unless the court cannot complete its administrative duties without resolving the controversy. In determining whether that rule was correctly applied in this case, it is appropriate that we examine the nature of the right that the appellants asked the bankruptcy court to enforce.

*Id.* at 18 (citations omitted). After laying out New York law on the subject of attorneys' liens, the Second Circuit emphasized that, "the attorney's lien is upon [the fund allocated to the payment of the client's claim] only, nothing else." *Id.* (citations omitted).

The Circuit Court went on to hold:

> In this case, appellants seek more; they ask the bankruptcy court to enforce a lien upon the proceeds of the loan obtained by Gordon and Sarubin, a fund that was in no way the fruit of appellants' labor. In

short, appellants ask the bankruptcy court to enforce a lien that does not exist.

> Whether the bankruptcy court could accede to appellants' request involves essentially a question of its jurisdiction in view of the fact that the loan proceeds were not part of the debtor's estate or under the control of the court. If the bankruptcy court were to exercise jurisdiction, it would have to be through its supervision of the creditor Gordon. The court had no jurisdiction over Gordon's partner Sarubin or the lending institution that granted the loan. Under the circumstances of this case, we conclude that the bankruptcy court did not err in applying the general rule that, as a creditor, Gordon was subject to the court's jurisdiction in his dealings with the debtor, but not in his dealings with third parties.

*Id.* at 18–19 (citations omitted).

*Shirley Duke* supports rather than suggests the absence of jurisdiction here. It is undisputed that Kreisler's settlement proceeds are the "fruit of the [attorneys'] labor," and come directly from this chapter 11 estate. I approved the settlement agreement and presided over the dispute which gave rise to the proceeds. The exercise of jurisdiction is therefore appropriate. *See In re Pathe News, Inc.,* 276 F.Supp. at 673; *In re Pan Am. Corp.,* 166 B.R. 538 (S.D.N.Y.1993).

I do not believe that my determination of the parties' dispute runs afoul of *Celotex Corp. v. Edwards,* —— U.S. ——, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). There the Supreme Court recognized that whereas the bankruptcy court's jurisdiction cannot be limitless, " 'Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy case.' " *Id.* at ——, 115 S.Ct. at 1499 (citing *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984); H.REP. No. 95–595, pp. 43–48 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5829, 5834). To accomplish this, the Supreme Court suggested that the "related to" language of § 1334(b) must be read to give district courts (and bankruptcy courts under § 157(a)) "jurisdiction over more than simple proceedings involving the property of the

debtor or the estate." *Id.* at ——, 115 S.Ct. at 1498. *See Local Loan v. Hunt,* 292 U.S. 234, 239, 54 S.Ct. 695, 696–97, 78 L.Ed. 1230 (1934) (holding that bankruptcy court had ancillary jurisdiction to issue an injunction to prevent suit in state court which might contravene bankrupt's discharge).

The appropriate test for determining "related to" jurisdiction is whether the outcome of the proceeding "might have any conceivable effect" on the bankrupt estate or if the proceeding has "any significant connection" with the bankrupt estate. *Publicker Indus., Inc. v. United States (In re Cuyahoga Equipment Corp.),* 980 F.2d 110, 114 (2d Cir.1992); *see also Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) (cited with approval by *Celotex Corp. v. Edwards,* —— U.S. ——, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)); *cf. Peacock v. Thomas,* —— U.S. ——, ——, 116 S.Ct. 862, 867, 133 L.Ed.2d 817 (1996) ("jurisdiction may extend to claims having a factual and logical dependence to the 'primary lawsuit' ").

The determination of whether a portion of the funds promised Kreisler in settlement of his proof of claim is payable to Stroock because of its asserted charging lien is within this court's bankruptcy jurisdiction on at least two bases. Arguably, the determination is core because it affects the administration of the estate and the adjustment of the debtor-creditor relationship. *See* 28 U.S.C. §§ 157(b)(2)(A) and (O). At a minimum there is "related to" jurisdiction because the determination of the lien has a significant connection with the bankruptcy estate: the settlement proceeds emanate directly from that estate in settlement of a disputed proof of claim over which I presided; Stroock's services were performed solely in connection with the bankruptcy case; and the settlement of the controversy regarding Kreisler's proof of claim was the fruit of Stroock's labor. Stroock's claim has a factual and logical dependence on the underlying proceedings. *See In re Walker,* 51 F.3d 562, 572 (5th Cir.1995) (Congressional conferral of jurisdiction over matters that are "related to" or "arising in" a bankruptcy proceeding allows a bankruptcy court to hear all supplemental claims that have a logical relationship to an underlying bankruptcy proceeding). Inasmuch as Kreisler has expressly consented to my final resolution of this matter, it is unnecessary for me to decide whether my jurisdiction is core or noncore. *See* 28 U.S.C. § 157(c)(2).

I turn now to the merits of the claimed lien.

### B. *Charging Lien*

Section 475 of the New York Judiciary Law provides:

From the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department, except a department of labor, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, judgment or final order in his client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

N.Y.JUD.LAW § 475 (McKinney 1996).

■■■ The attorney may collect out of the funds or property obtained on the client's behalf on the theory that it is the attorney who has created the fund out of which he or she seeks to be paid. *Petition of Rosenman & Colin,* 850 F.2d 57, 61 (2d Cir.1988) (citations omitted). "In the event of settlement, the attorney's lien attaches to the fund representing the cause of action extinguished by the settlement." *Shirley Duke,* 611 F.2d at 18. In the bankruptcy setting, an attorney's lien attaches to the fund allocated to the payment of the client's claim. *In re Pathe News,* 276 F.Supp. 670. "[A] charging lien does not depend upon possession but rather upon the existence of identifiable proceeds of the litigation." *Kaplan v. Reuss,* 113 A.D.2d 184, 186–87, 495 N.Y.S.2d 404, 406–07 (2d Dep't 1985) (citations omitted), *aff'd,* 68 N.Y.2d 693, 506 N.Y.S.2d 304, 497 N.E.2d 671 (1986).

"An attorney has the burden of showing that a fee contract is fair, reasonable, and fully understood by the client." *Jacobson v. Sassower,* 66 N.Y.2d 991, 489 N.E.2d 1283, 1284, 499 N.Y.S.2d 381, 382 (1985); *Sand v. Lammers,* 150 A.D.2d 355, 540 N.Y.S.2d 876, 877 (2d Dep't 1989). Under a fee arrangement where the attorney and client agree to either a fixed or contingent fee, New York courts will usually grant a lien in the agreed-upon amount unless the agreement was procured by fraud or overreaching. *Spielvogel v. Harkins & Maeger Ltd.,* 639 F.Supp. 1397, 1399–1400 (S.D.N.Y. 1986) (citations omitted). But where, as here, the fee arrangement is open ended, New York courts will fulfill the lien only to the extent that the fee is reasonable in light of the services rendered. *Id.* To arrive at the value, a court may consider:

1. the nature of the services rendered;
2. the standing of the attorney in his profession, for learning, skill, and proficiency;
3. the skill required to perform the services including the lawyer's experience and ability;
4. the time and labor required;
5. the difficulty of the questions presented;
6. the amount involved;
7. the importance to the client of the result;
8. the benefit resulting to the client from the services.

*See Randall v. Packard,* 142 N.Y. 47, 36 N.E. 823 (1894); *Estate of Freeman,* 34 N.Y.2d 1, 311 N.E.2d 480, 355 N.Y.S.2d 336 (1974); *Cass & Sons, Inc. v. Stag's Fuel Oil Co.,* 148 Misc.2d 640, 642, 561 N.Y.S.2d 519, 521 (Sup. Ct.Queens County 1990), *aff'd as modified,* 194 A.D.2d 707, 601 N.Y.S.2d 803 (2d Dep't 1993); *Granada Condo. I v. Morris,* 225 A.D.2d 520, ——, 639 N.Y.S.2d 91, 93 (2d Dep't 1996); N.Y.Code of Professional Responsibility DR 2–106(b).

To establish a *prima facie* case of reasonableness, the attorney may rely on the "well settled legal principle that an account stated may be established between an attorney and his client." *See Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F.Supp. 714, 719 (S.D.N.Y.1986); *see also* *Shea & Gould v. Red Apple Cos. Inc. (In re Shea & Gould),* 198 B.R. 861, 870 (Bankr. S.D.N.Y.1996); *Coudert Brothers v. Finalco Group, Inc.,* 176 A.D.2d 622, 575 N.Y.S.2d 65 (1st Dep't 1991). The theory is that "[i]t is not necessary to establish the reasonableness of the fee since the client's act of holding the statement without objection will be construed as acquiescence as to its correctness." *O'Connell & Aronowitz v. Gullo,* —— A.D.2d ——, ——, 644 N.Y.S.2d 870, 871 (3d Dep't 1996). In such an event, the billing statement becomes an account stated:

An account stated is an agreement, expressed or implied, that an examination of the account between the parties has occurred, a statement of that account has been asserted, and accepted as correct. This agreement reflects the amounts due on past transactions and may be implied by the sending of a statement by the creditor and the debtor's failure to dispute its correctness.... A failure to object raises the presumption of an agreement as to the correctness of the account. If defendant received plaintiff's accounts and did not expressly assent, but failed to object within a reasonable time, then he is bound by that account stated unless fraud, mistake, or another equitable consideration is present.

*Polygram, S.A. v. 32–03 Enters., Inc.,* 697 F.Supp. 132, 136 (E.D.N.Y.1988) (contract for sale of goods).

Once an account stated is shown, the burden shifts to the client to show in what manner the account is incorrect. *Four Star Comics Corp. v. Kable News Co.,* 289 F.2d 632, 635 (2d Cir.1961). "The reasonableness of the delay in objecting usually presents an issue of fact" which is to be determined in light of all the circumstances. *Dreyer & Traub v. Rubinstein,* 191 A.D.2d 236, 594 N.Y.S.2d 257, 258 (1st Dep't 1993). However, payment on account or an "agreement to pay a portion of the indebtedness, gives rise to an actionable account stated" shifting the burden to the objectant to point to why the documented fees are not reasonable. *See Shea & Gould v. Burr,* 194 A.D.2d 369, 370–71, 598 N.Y.S.2d 261, 262 (1st Dep't 1993) (quotations and citations omitted); *Kramer, Levin,* 638 F.Supp. at 719–720.

Kreisler received detailed monthly statements for the year of representation.

He paid the first in full. Then, more than one month after receiving the next two bills (which reflected descriptions of the services rendered, the hours performed and the hourly rate of the attorneys), Kreisler promised to pay those bills when he had the necessary funds in hand. Then, after receiving the next three bills, he and Stroock engaged in many conversations about the unpaid balance, Kreisler further assuring Stroock payment of $200,000 (which represented the total unpaid balance at that time). Kreisler did not complain about the magnitude of the fees or the services being performed. "This is not the action of a litigant who believes that his lawyer has been consistently overbilling." *Conway,* 1994 WL 623057 at \*3. Because Kreisler, after receiving the statements and engaging in numerous discussions regarding the outstanding balance, did not object and actively assured payment in full, the delay preceding his objection was unreasonable. Under *Polygram,* 697 F.Supp. at 136, Kreisler's actions constituted an implied assent to the correctness of the accounts, and, absent Kreisler's demonstrating "in what manner the account is incorrect" Stroock is entitled to payment on account. *See Four Star Comics,* 289 F.2d at 635.

Kreisler argues that the monthly statements could not constitute an account stated because they were not "final bills." He cites *Ellenbogen & Goldstein, P.C. v. Brandes,* 266 A.D.2d 237, 641 N.Y.S.2d 28 (1st Dep't 1996); *Shea & Gould,* 194 A.D.2d 369, 598 N.Y.S.2d 261; and *Kramer, Levin,* 638 F.Supp. 714.[6]

Whatever merit this argument may have had in another context it is not relevant here—for Kreisler did not simply sit back and fail to object to the bills in anticipation of the litigation's conclusion. He participated in conferences regarding his hefty outstanding balance and on more than one occasion assured that payment would be made. He did not raise concern about the extent of the bills or to any service being provided. In addition, Kreisler paid the first bill in full and promised to pay Stroock's second and thirds bills in full by April. As to Stroock's fourth, fifth, and sixth bills, Kreisler engaged in many conversations with Golden regarding the unpaid balance and further assured that payment would be made, this time with the proceeds of yet another personal transaction set to close on June 15. That the interim statements were not final bills covering the entire period of representation under these circumstances does not prevent them from being considered accounts stated for the purposes of determining which party has to move forward with proof. *See Coudert Brothers,* 176 A.D.2d 622, 575 N.Y.S.2d 65; *Dreyer,* 191 A.D.2d at 236, 594 N.Y.S.2d at 258.

■■■ As for the remainder of Stroock's services from April 1 through the end of the case, the burden of proving the reasonableness of fees and expenses falls upon Stroock. In this vein, Stroock may establish reasonableness by submitting evidence consisting of regularly kept business records showing the actual work done by the attorneys and the rates charged for that work. *See Ingber v.*

**6.** These cases do not even stand for the proposition for which they are cited. *Ellenbogen* held that "Defendant's retention, without objection, of plaintiff's monthly bills and final bill for the four-and-a-half-month period between its receipt and commencement of this action, along with her payment of [a] portion of the indebtedness, gave rise to an actionable account stated." 641 N.Y.S.2d at 29. "The validity of the account is not undermined by any understanding the parties may have had at the commencement of their relationship to defer payment until proceeds were realized from plaintiff's efforts." *Id.*

In *Shea & Gould,* the firm sent a final unitemized bill to the client for $55,812.04, and thereafter had discussions with him regarding payment. As a result of those conversations, the client paid $5,000. In addition, the law firm attempted to reach an agreement with the client whereby the balance would be paid over a specified period

with interest but the client never executed or returned the promissory note embodying those terms. The court held that a valid account stated had been established by the client's failure to object during the five month period following receipt of the bill, especially in view of the partial payment made. 598 N.Y.S.2d at 262.

In *Kramer, Levin,* the law firm sent semi-monthly statements to the client over the period April 1977 through September 1979, and sent a final statement to the client in September 1979. The court held that the client's objection to the fees in 1982 did not defeat summary judgment on the law firm's account stated theory. The court also noted that because Kramer Levin submitted time sheets identifying the attorney, the particular matter worked on, and the hours accrued, it could also recover the reasonable value of the services provided in quantum meruit. 638 F.Supp. at 720.

*Pirog,* 176 A.D.2d 1163, 575 N.Y.S.2d 603, 604 (3d Dep't 1991). Once the attorney makes a *prima facie* showing of reasonableness, the burden of going forward with evidence shifts to the client and the client must object with specificity to demonstrate why the documented fees are not reasonable. *Ingber,* 575 N.Y.S.2d at 604; *Kramer, Levin,* 638 F.Supp. at 720.

Stroock has submitted regularly kept business records supporting the time spent on Kreisler matters. Upon my review of the billing statements and my recollection of the case, the services rendered for the period between April and July 1996 consisted of preparation for the estimation hearing, which included discovery demands, court conferences, depositions, legal research, document review, and preparation of exhibits, briefs, and witnesses. During this period, Stroock also continued to research and prepare Kreisler's objection to the plan of reorganization and his answer to the preference complaint. And, insofar as the estimation decision was not to end the litigation, Stroock continued to prepare for trial on Kreisler's administration claim. At the same time, Stroock also negotiated, researched attendant legal issues, and prepared for a complete settlement of all Kreisler's claims.

██ Stroock has demonstrated that it provided substantial services to Kreisler which required a considerable amount of time and labor. An executive's entitlement to administrative expense priority for a multimillion dollar postpetition severance benefit was a complex issue which was extremely important to Kreisler. Stroock's services certainly lived up to its good reputation. Except as discussed above, a review of Stroock's time records does not reveal any obviously unauthorized or unsupported time charges. Kreisler has not come forth with evidence to support his allegation that the bills are unreasonable. Simply stated, conclusory allegations do not support a reduction in fees. *Kramer, Levin,* 638 F.Supp. at 720–21; *Ingber,* 176 A.D.2d at 1163, 575 N.Y.S.2d at 604.

That Stroock changed the settlement agreement to provide the monies would be delivered to Stroock instead of directly to Kreisler is of no relevance, Kreisler having been aware of the change before he executed the settlement agreement. In any event, the existence of the charging lien does not depend upon Stroock's possession of the proceeds, as a result of which Stroock's change does not affect the outcome of its motion. *See Kaplan,* 495 N.Y.S.2d at 406.

Kreisler's belated objection to Kahn's services does not entitle him to a reduction in fees. The district court for the Southern District of New York faced an objection to experts' fees in *Conway,* 1994 WL 623057, at *5, where the client insisted that the experts "were unsupervised, overpaid, billed for work unperformed and in one case, grossly unqualified." There, as here, conclusory allegations were insufficient to support a reduction in fees. Although Stroock was less than diligent in timely furnishing Kreisler Kahn's bills, Kreisler reviewed those bills prior to the estimation hearing, paid Kahn, and elected to continue with the services. Kahn supplied statements indicating the work performed on Kreisler's behalf and explanations as to why the hours appeared high. Kreisler has not come forward with any proof that the documented fees were unreasonable.

██ Unlike with Kahn, Stroock was sufficiently careless with Buck's bills that it ought not be reimbursed for the full amount of that firm's charges. It is Stroock's burden to show that the fee is reasonable and fully understood by the client. Stroock did not demonstrate that Buck's services were fully understood by Kreisler. Stroock advised Kreisler to utilize Buck's services and provided Kreisler with a $20,000 estimate. Stroock has not submitted any evidence to show that Buck's expanded duties were understood or approved by Kreisler. Nor has Stroock provided any detail to justify Buck's charges. No evidence has been submitted which would lead me to conclude that Stroock ever sent Kreisler the first bill in early May (before the bulk of the services were rendered) which reflected that Buck had already earned $21,000. Significantly, Stroock did not educate itself on how Buck billed for its services even after Buck's first bill exceeded budget. And Stroock did not send the bill to Kreisler, effectively impeding Kreisler's ability to assess his expenses and direct his professional's work. Nonetheless, I presume that $20,000 of Buck's fees were both reasonable and necessary insofar as Kreisler, an experienced businessman, consented to the

378

second expert's retention knowing that the services would cost approximately that much. However, in the absence of evidence described above I see no reason to presume that Buck's services for the second bill were either reasonable or necessary.

■ Accordingly, Stroock is denied an attorneys' charging lien for the second of Buck's bills—$27,945 and for the amount of the first bill which exceeded the $20,000 estimate. Likewise, Stroock is denied an attorneys' lien for its costs in deposing Poster after the conclusion of the estimation hearing—$6,215. Stroock is also denied an attorneys' charging lien for the improper charges to Kreisler's account described above and aggregating $1,367.48, and for the cost of both Golden's and Simonds' presence at the estimation hearing, $3,669. Stroock is granted a charging lien for the remainder of its request. Stroock is authorized to enforce the lien against the proceeds of Kreisler's settlement.

The parties are directed to SETTLE AN ORDER consistent with this decision.